[Cite as *State ex rel. DeWine v. Osborne Co., Ltd.*, 2018-Ohio-3109.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO ex rel.<br>MICHAEL DEWINE,<br>OHIO ATTORNEY GENERAL, | : <br><br>: | **OPINION**<br>**ON RECONSIDERATION** |
| Plaintiff-Appellee, | : | **CASE NO. 2016-L-091** |
| - vs - | : | |
| OSBORNE CO., LTD., et al., | : | |
| Defendants-Appellants. | : | |

Civil Appeal from the Lake County Court of Common Pleas, Case No. 2014 CV 000166.

Judgment: Affirmed in part and reversed in part; remanded.

*Mike DeWine*, Ohio Attorney General; *Gregg H. Bachmann*, *Nicole Candelora-Norman*, and *Amy Factor*, Assistant Attorneys General, State Office Tower, 30 East Broad Street, 25th Floor, Columbus, OH 43215 (For Plaintiff-Appellee).

*Richard N. Selby, II*, Dworken & Bernstein Co., L.P.A., 60 South Park Place, Painesville, OH 44077 (For Defendants-Appellants).

ON RECONSIDERATION[1]

TIMOTHY P. CANNON, J.

{¶1}     Appellants, Osborne Co., Ltd. and the Executors of the Estate of Jerome T.

Osborne, appeal from an August 1, 2016 judgment of the Lake County Court of Common

---

1. The original announcement of decision, *State of Ohio ex rel. DeWine v. Osborne Co., Ltd.*, 11th Dist. Trumbull No. 2016-L-091, 2017-Ohio-8284, released October 23, 2017, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. *See* App.R. 26(A)(1).

Pleas. The trial court ordered appellants to pay a civil penalty for violating Ohio Revised Code Chapter 6111 and ordered injunctive relief in favor of appellee, Michael DeWine, Ohio Attorney General. This judgment is affirmed in part and reversed in part for the reasons that follow.

{¶2} On May 29, 2012, appellee filed a complaint, in Case No. 12 CV 001459, against Defendants Jerome T. Osborne ("Mr. Osborne") and Osborne, Inc. Appellee subsequently filed an amended complaint, which substituted Osborne Co., Ltd. ("Osborne Co.") for Osborne, Inc. The trial court denied a motion for partial summary judgment filed by appellee on January 17, 2014. On January 22, 2014, Osborne Co. was voluntarily dismissed from Case No. 12 CV 001459, and appellee filed a complaint against Osborne Co. in Case No. 14 CV 00166. The trial court consolidated the two cases on January 30, 2014. On August 15, 2014, the trial court granted a motion to substitute the Executors of Jerome T. Osborne's Estate as defendants, following Mr. Osborne's death. The executors are identified as Richard M. Osborne, Sr.; Georgeanne Osborne Gorman; Michael E. Osborne; Jacqueline Osborne Fisher; William V. Krug; Jerome T. Osborne, III; William L. Mackey; and Jeremy Cash Osborne.

{¶3} The complaints against each appellant—Osborne Co. and Mr. Osborne's estate—set forth three causes of action, each alleging violations of Ohio's Water Pollution Control Laws as found in Revised Code Chapter 6111.

{¶4} Count One alleges appellants violated R.C. 6111.04(A) and R.C. 6111.07(A) by failing to obtain a certification from the Ohio Environmental Protection Agency ("Ohio EPA") under Section 401 of the Clean Water Act or a Section 404 permit from the U.S. Army Corps of Engineers before engaging in certain activities within and

2

along the East Branch Chagrin River that resulted in "(1) the placement of dredged or fill material and/or wastes into waters of the State; and (2) degradation of certain portions of the East Branch Chagrin River and the threatened degradation of other portions [of] these waters of the state."

{¶5} Count Two alleges appellants violated R.C. 6111.04(A) and R.C. 6111.07(A) by failing to obtain a construction storm water discharge permit before engaging in construction activities that resulted in "disturbing one or more acres of land within and along two miles of stream channel of the East Branch Chagrin River."

{¶6} Count Three alleges appellants violated R.C. 6111.04(A) and R.C. 6111.07(A) because they polluted the East Branch Chagrin River, without a permit, by discharging storm water from land within and along two miles of stream channel of the East Branch Chagrin River, and thereby created a public nuisance.

{¶7} The parties submitted a joint stipulation of facts with regard to many issues in the case. With regard to remaining disputed facts, the matter ultimately proceeded to a bench trial in January 2016.

{¶8} This case arose after an employee of the Ohio EPA observed William Franz, an employee of Osborne Co., operating a track hoe in the middle of the East Branch Chagrin River. In his deposition, Mr. Franz testified that he was removing silt so the river would flow. The parties stipulated that Mr. Osborne instructed Mr. Franz to use the track hoe to remove sand and gravel from the stream bed and relocate this material along the edge of the stream, on the stream banks, and in the middle of the river. The parties also stipulated that, on certain occasions when the track hoe's bucket could not reach the river bank, Mr. Franz would place piles in the river, then relocate the track hoe and move those

3

piles to the bank of the river. Another stipulation was that Mr. Osborne personally observed some of Mr. Franz's work and that he would usually call Mr. Franz the night before or first thing in the morning and tell him what project to work on each day and what to do for the project. After work was completed, Mr. Osborne would usually call Mr. Franz to ask how the work for the day went.

{¶9} The parties stipulated that appellants were performing the work on the river pursuant to agreements with the Village of Kirtland Hills, reached in 1983 and 1990, to maintain the river banks. In exchange for the work performed on the river, Mr. Osborne was allowed to farm certain property owned by the Village of Kirtland Hills. The work was done throughout the years from River Mile 4.30 to River Mile 6.15.[2] Most of the work performed in or near the river was on property owned either by the Village of Kirtland Hills or Mr. Osborne.

{¶10} The parties stipulated that the East Branch Chagrin River is a "water of the state," as that term is defined in R.C. 6111.01; that it was designated as a State Scenic River by the Ohio Department of Natural Resources ("ODNR") on July 2, 1979; that it is designated as an Outstanding State Water for Ecological Value; and that its beneficial use designations are cold water habitat,[3] seasonal salmonid habitat, primary contact recreation, and agricultural/industrial water supply.

---

2. Testimony at trial explained that a "river mile" is similar to a mile marker on a highway. Here, it is measured by the distance from Lake Erie (R.M. 0) to the source of the river. R.M. 6.15 is upstream of R.M. 4.30 and is just upstream of St. Hubert's Church, located at 8870 Baldwin Road, Village of Kirtland Hills, Ohio. R.M. 4.30 is near the western boundary of property owned by the Village of Kirtland Hills.

3. Testimony at trial explained that cold water streams in Ohio are generally small, with small drainage systems. A cold water stream such as the East Branch Chagrin River is unique due to its size. It provides a large cold water habitat the State of Ohio seeks to preserve.

4

{¶11} The parties stipulated that Mr. Franz, at the direction of Mr. Osborne, operated the track hoe in the river on 24 separate occasions from 2001 through 2007. Each of these occasions involved dredging the river and placing dredged material along the river bank or in the middle of the river. Evidence was introduced at trial that the dredged material formed nine piles, anywhere from eight- to twenty-feet high, for extended distances along the river bank. At least 25,656 cubic yards of river bottom were dredged. Most of the dredged material was piled on property owned by either the Village of Kirtland Hills or Mr. Osborne. One pile, referred to as "the Oliva pile," was located on private property near St. Hubert's church.

{¶12} According to trial testimony, the river had been excavated down to the bedrock in many areas between R.M. 4.30 and R.M. 6.15, which resulted in the river losing access to its floodplain and caused significant bank erosion. The state also introduced testimony that appellants' activities resulted in a loss or degradation of the habitat for fish and macro invertebrates.

{¶13} Paul Anderson, an environmental specialist in the surface water division of the Ohio EPA, became aware of the work being done in the river on July 13, 2007, at which time it ordered appellants to cease work in the river. Appellants complied. The Ohio EPA immediately performed a site survey and concluded the site was severely impacted by substrate removal and reworking and by placement of removed material in the floodplain and bankfull area:[4] the habitat was severely simplified, siltation was high, and erosion was potentially high.

---

4. Testimony at trial explained that the "bankfull area" is the portion of the stream channel that is large enough to contain the stream under most flow conditions. This area is either bare or has aquatic and annual vegetation; perennial vegetation cannot grow there because its roots are too wet or its seedlings get swept away. The floodplain lies above the bankfull area.

5

{¶14} The U.S. Army Corps of Engineers thoroughly inspected the river one week later. The parties stipulated that Mr. Osborne received a letter from the Corps in August 2007, stating the work in the river was an unauthorized activity and in violation of the Federal Clean Water Act. The letter stated, in part:

> The inspection found that gravel and natural stone were excessively dredged from the stream at several locations, and disposed or stockpiled in the floodway and below the ordinary high water elevation, and also in the stream channel. No Department of the Army authorization was issued for this activity. Therefore, this work is an unauthorized activity and in violation of the Clean Water Act.

The letter directed Mr. Osborne not to perform any additional activities in the river and advised that any further work would be considered a knowing and willful violation of federal law, subjecting him to civil penalties.

{¶15} The parties stipulated that Mr. Osborne also received a notice of violation from the Ohio EPA in August 2007, alleging violations of Ohio Revised Code Chapter 6111. The notice also alleged violations of Ohio Administrative Code ("OAC") section 3745-1-04. This notice stated, in part:

> The illegal activity began upstream of St. Hubert's Church on the East Branch of the Chagrin River and continued downstream approximately 8,700 feet. The inspection team observed that materials had been and were being side cast from the river bed onto various sections of the river bank. This activity constitutes a violation of [R.C.] 6111.04, which prohibits any person from causing pollution to any waters of the State without a valid unexpired permit issued by the Director of Ohio EPA. [R.C.] 6111.07 states that no person shall violate or fail to perform any duty imposed by rules adopted by Ohio EPA. The activities observed caused violations of [OAC] 3745-1-04, which contains criteria applicable to all waters of the State. Please be advised that failure to comply with the above laws may be cause for enforcement action pursuant to [R.C.] Section 6111 and subject you to civil penalties identified in [R.C.] 6111.09(A).
>
> Please inform this office in writing, within ten days of receipt of this notification, of the description of the action(s) proposed to address

6

these violations. Please provide all documentation associated with this activity including the intent of the activity, contracts with others to perform the activity, and a record of when this activity had been previously performed.

{¶16} Mr. Osborne responded by letter, through his attorney, on September 10, 2007. Mr. Osborne noted he began utilizing the land located in the Village of Kirtland Hills pursuant to an oral agreement in the late 1970s; this oral agreement was confirmed by written agreements in 1983 and 1990. Pursuant to these agreements, Mr. Osborne undertook erosion control and bank stabilization measures on the property on an intermittent basis. He indicated there were no records or documentation associated with said erosion control and bank stabilization measures. The letter ended by stating, "Mr. Osborne proposes no actions at this time to address the alleged violations" and that nothing in the letter shall be deemed an admission as to any unlawful activities; "in fact, for the record, Mr. Osborne denies any unlawful activities[.]"

{¶17} On November 1, 2007, Randall Keitz, a floodplain engineer with ODNR, surveyed the disturbed area of the river. He concluded, as a result of this survey, that the river was highly unstable with considerable ongoing erosion of the river banks due to the limited channel width and increased velocity of the water. Trees along the banks were being undermined, and access to the floodplain was very limited.

{¶18} On November 2, 2007, the U.S. Army Corps of Engineers sent a letter to the director of the Ohio EPA, noting the work was done without authorization and in violation of the Clean Water Act. It authorized the Ohio EPA to immediately begin remedial and restoration measures without needing to obtain any further approval or permits from the Corps.

7

{¶19} Over the next two years, the Ohio EPA met with Mr. Osborne and the Village of Kirtland Hills to negotiate remediation of the river. On April 29, 2009, the Ohio EPA provided a proposed draft of a settlement, titled "Director's Final Findings and Orders," to appellants in an attempt to administratively settle the violations of R.C. Chapter 6111. The draft states, in Paragraph 3 of the Findings, that appellants altered approximately two miles of the stream channel in violation of R.C. Chapter 6111 and the Clean Water Act by dredging from and depositing fill material in the river. Paragraph 8 states that constriction of the floodplain remains a significant concern: lowering of the stream channel elevation and stockpiling of material along the stream banks significantly limits the amount of energy dissipation that can occur during flood events. Paragraphs 9 and 10 state that placement of dredged substrates directly upon the stream bank has increased the risk of flood damage, and lowering of the channel bed has caused bank erosion problems. Paragraph 11 states the river is not meeting certain biocriteria outlined in OAC 3745-1-07 due to habitat modification and disturbance.

{¶20} The draft then outlines several Orders directing appellants to implement a plan designed to fully remediate the river. It states that "[t]he Plan shall focus on facilitating the natural recovery of the river. Where appropriate, the plan may include replacement of the stockpiled substrates within the stream channel to provide enhanced habitat, to expedite the stream channel recovery process or to stabilize streambanks at specified locations."

{¶21} A section of the draft, titled "Reservation of Rights," provides, in part:

Ohio EPA reserves the right to take any action, including but not limited to any enforcement action for civil or administrative penalties against Respondent for violations specifically cited in these Orders, action to recover costs, or action to recover damages to natural

resources, action to compel further remediation pursuant to any available legal authority as a result of past, present, or future violations of state or federal laws or regulations or the common law, and/or as a result of events or conditions arising from, or related to, the Site. Upon termination pursuant to the Termination Section of these Orders, Respondent shall have resolved their liability to Ohio EPA only for the Work performed pursuant to these Orders.

{¶22} Larry Reeder, enforcement supervisor of the surface water division at the Ohio EPA, testified that it did not intend to pursue a civil penalty against appellants at the time they were negotiating. Cynthia Paschke also testified regarding these negotiations. Ms. Paschke was qualified as an expert witness, limited to the collection and analysis of habitat data in the river, and she also represented appellants during their negotiations with the Ohio EPA. Ms. Paschke testified that appellants were prepared to move forward with the negotiated restoration project had the Ohio EPA waived its reservation of rights regarding future administrative and civil penalties, as it had done with the Village of Kirtland Hills. The Ohio EPA did not waive its reservation of rights, and Mr. Reeder testified he was notified in May 2009 that appellants would not sign the draft agreement and would not move forward with the restoration project. As a result, on June 25, 2009, the director of the Ohio EPA requested in writing that the Ohio Attorney General initiate civil proceedings against appellants.

{¶23} On July 27, 2009, the Village of Kirtland Hills signed a settlement agreement with the Ohio EPA (i.e., the final version of the Director's Final Findings and Orders). The village agreed, in part, to do the following: (1) remove the piles placed on the floodplain and redistribute the material into and along the river channel; (2) develop a plan to construct bank stabilization where appropriate to reduce bank erosion and stress; (3) develop a plan to re-vegetate exposed areas following excavation and construction

activities; (4) develop a plan for storm water pollution prevention; (5) provide a schedule for implementing the plans and submitting reports to the Ohio EPA; (6) submit a plan to monitor river channel morphology, habitat quality, and biological water quality; and (7) submit a plan for the creation of a riparian buffer along the river that provides for permanent protection through a conservation easement or an environmental covenant. The "Reservation of Rights" section of this agreement, Section XI, simply provided that the "Ohio EPA and Respondent each reserve all rights, privileges and causes of action, except as specifically waived in Section XI of these Orders." Mr. Reeder testified that the Ohio EPA was not seeking a financial penalty against the Village of Kirtland Hills.

{¶24} The Village of Kirtland Hills hired Oxbow River and Stream Restoration, Inc. ("Oxbow") to perform the remedial work in the river. In January 2011, Oxbow developed a storm water pollution prevention plan, a stream restoration plan, and a stream restoration project summary of work. The remediation work outlined in the settlement agreement was largely completed by November 2013. Oxbow had redistributed approximately 25,000 cubic yards of previously dredged material into approximately 5,260 linear feet of active channel; stabilized approximately 1,240 feet of stream bank; and planted native grasses, sedges, shrubs, and trees on approximately 11.5 acres of land. Mr. Anderson testified that the river bed had been raised one to two feet in most locations, which improved access to the floodplain. The Oliva pile, however, was not removed and redistributed; apparently, the Village of Kirtland Hills refused to authorize work on property not under its control.

{¶25} William Zawiski, a water quality supervisor with the Ohio EPA, testified that he conducted a habitat evaluation on November 19, 2013. The restoration work had

improved the habitat, but the river still needed more cover and pools; the river had not fully recovered from the unauthorized activities.

{¶26} Mr. Keitz testified that he conducted a stream channel classification survey in December 2013. The river remained moderately entrenched and could barely reach its floodplain; the river remained highly unstable with no bank protection. He recommended planting trees and other vegetation to stabilize the banks and further raising the bed, by adding rocks and other material, to slow river velocity and create habitats.

{¶27} The parties submitted post-trial briefs at the conclusion of the bench trial. Appellants restated the defenses they had raised at various stages throughout the case. First, appellants argued the statutory framework under which the complaint was brought (R.C. 6111.04 & R.C. 6111.07) does not prohibit dredging; thus, the only alleged violations at issue relate to the unauthorized discharge of dredged materials into the river. Second, appellants argued the statutes at issue do not require one to obtain a permit; rather, obtaining a permit "provides a safe harbor, whereby individuals or companies who obtain a permit are exempted from these pollution laws." With regard to the imposition of a civil penalty, appellants argued the State had mischaracterized its failure to perform any remediation on the river as a result of recalcitrance, instead of recognizing it as a result of the Ohio EPA's refusal to waive civil penalties.

{¶28} On August 1, 2016, the trial court found in favor of the State of Ohio on all three counts.

{¶29} Regarding Count One—which alleged that defendants violated R.C. 6111.04(A) and R.C. 6111.07(A) by failing to obtain Section 401 and Section 404 permits

prior to commencing work in the river—the trial court found appellants' activities along the East Branch Chagrin River resulted in the placement of dredged material in the river in excess of one cubic yard, thus triggering the requirement to obtain the permits.

{¶30} Regarding Count Two—which alleged appellants violated R.C. 6111.04(A) and R.C. 6111.07(A) by failing to obtain a construction storm water discharge permit before engaging in construction activities—the trial court found the State had shown that appellants disturbed one or more acres of land along the East Branch Chagrin River, thus triggering the requirement to obtain the permit. The trial court stated appellants' claim that the permitting process merely provides a safe harbor exemption from Ohio's water pollution laws has no basis in law.

{¶31} Regarding Count Three—which alleged that appellants violated R.C. 6111.04(A) and R.C. 6111.07(A) because they polluted the river by discharging storm water from land within and along two miles of stream channel of the river—the trial court stated it was closely related to Counts One and Two and, "[a]pplying the factors and analysis applied in count two," it found in favor of the State.

{¶32} The trial court found Mr. Osborne was subject to personal liability on all three counts and therefore held his Estate jointly and severally liable along with Osborne Co.

{¶33} The trial court found that significant harm to the river environment was caused by appellants' dredging; appellants were aware of the requirement to at least obtain a National Pollutant Discharge Elimination System permit, but failed to do so; appellants avoided the costs of various permits and obtained an economic benefit from farming the land owned by the Village of Kirtland Hills; and the State incurred

12

extraordinary enforcement costs. As a result, the trial court imposed a civil penalty of

$404,240.00, plus post-judgment statutory interest.

> This amount consists of $180,000 for 24 days of active dredging of the East Branch Chagrin River with each day being assessed a $7,500 penalty. This amount also includes $184,080 for creating a public nuisance by leaving spoil piles along the river from July 13, 2007 to November 1, 2013 (the date the Village of Kirtland Hills completed its portion of remediation) for a total of 2,301 days at $80 per day and an additional $40,160 for creating a public nuisance by allowing the remaining spoil pile to exist from November 2, 2013 to the present (July 29, 2016) for a total of 1,004 days at $40 per day.

{¶34} The trial court also ordered extensive injunctive relief, as follows:

(A) Defendants are permanently enjoined from discharging any pollution, other wastes, and dredge and fill material to waters of the State on or from the banks of the East Branch Chagrin River except in compliance with Chapter 6111 and any necessary permits and/or Section 401 certifications issued pursuant to Chapter 6111 and the rules adopted thereunder;

(B) Defendants shall submit a plan to the Ohio EPA to redistribute and/or remove the remaining pile in the East Branch Chagrin River within ninety days from the date of this judgment entry;

(C) Defendants shall implement and execute the approved redistribution and/or removal plan;

(D) Defendants shall submit a monitoring plan to characterize the current channel morphology, habitat quality, and biological water quality in the East Branch Chagrin River within ninety days from the date of this judgment entry;

(E) Defendants shall implement and execute the approved monitoring plan;

(F) Defendants shall submit a plan for the creation of a riparian buffer along the East Branch Chagrin River to bar construction activities and stream channel modifications except as authorized by the Ohio EPA within one hundred and twenty (120) days from the date of this judgment entry;

(G) Defendants shall implement and execute the approved riparian buffer plan; and

(H) Defendants shall submit a post-construction report to the Ohio EPA after completion of the remediation work and creation of the riparian buffer.

{¶35} Appellants filed a timely notice of appeal from the trial court's judgment entry and assert four assignments of error for our review. Their first assignment of error states:

{¶36} "The trial court erred in interpreting the state of Ohio's statutory claims to encompass all work performed in the East Branch Chagrin River without a permit, as opposed to limiting the state of Ohio's claims to the discharge of dredged materials into the East Branch/Chagrin River."

{¶37} All three counts alleged in the complaint are premised on violations of the Water Pollution Control Act, found in Revised Code Chapter 6111. Appellants first assert that the deposit of dredged materials into the East Branch Chagrin River, rather than the excavation of material out of the river, is the only conduct the trial court should have considered in determining whether appellants violated the relevant statutes. They also argue the trial court improperly relied on federal permit requirements to find liability under state statutes.

{¶38} Issues of statutory interpretation are questions of law, which we review de novo. *Riedel v. Consol. Rail Corp.*, 125 Ohio St.3d 358, 2010-Ohio-1926, ¶6 (citations omitted).

{¶39} The Water Pollution Control Act provides that "[n]o person shall violate or fail to perform any duty imposed by sections 6111.01 to 6111.08 of the Revised Code or violate any order, rule, or term or condition of a permit issued or adopted by the director of environmental protection *pursuant to those sections*. Each day of violation is a separate offense." R.C. 6111.07(A) (emphasis added). Also, at the time of the alleged

14

offenses, R.C. 6111.99(A) provided: "Whoever violates section 6111.04, 6111.042, 6111.05, or division (A) of section 6111.07 of the Revised Code shall be fined not more than twenty-five thousand dollars or imprisoned not more than one year, or both." Thus, we emphasize that "sections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A).

{¶40} Pursuant to R.C. 6111.03(G), the director of environmental protection may "[a]dopt, amend, and rescind rules in accordance with Chapter 119. of the Revised Code governing the procedure for hearings, the filing of reports, the issuance of permits, the issuance of industrial water pollution control certificates, and all other matters relating to procedure[.]" The director has adopted such rules, which are found in the Ohio Administrative Code at Chapter 3745.

{¶41} Appellants are charged with violating R.C. 6111.07(A) by violating R.C. 6111.04(A), which provides that "[n]o person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state." Any such action is declared to be a public nuisance, except in cases where the director has issued a valid and unexpired permit or renewal thereof, as provided in R.C. 6111.01 to R.C. 6111.08.

{¶42} Appellants are also charged with violating R.C. 6111.07(A) by violating OAC Rule 3745-32-02(A)(2). At the time of the alleged offenses, the rule provided: "A section 401 water quality certification is required to obtain * * * [a] permit from the army corps of engineers pursuant to section 404 of the Federal Water Pollution Control Act[.]" Appellants obtained neither a 401 certification or a 404 permit. Appellee's amended

15

complaint concluded that appellants had violated this rule by engaging in certain activities that resulted in pollution and degradation of the river without first obtaining a 401 certification or a 404 permit. This is not, however, conduct prohibited by the rule; this is conduct prohibited by R.C. 6111.04(A). Obtaining these permits would have provided appellants with an affirmative defense to an alleged violation of R.C. 6111.04(A). Appellee apparently anticipated appellants' inability to raise this defense and, in so doing, essentially alleged the same violation in two separate counts.

{¶43} It is worth noting that the language of OAC Rule 3745-32-02(A)(2) has since been amended. It now explicitly prohibits certain conduct, rather than merely proscribing a requirement for obtaining a 404 permit. It reads, in pertinent part:

> (A) Any applicant for a federal license or permit to conduct any activity which may result in a discharge of dredged or fill material to a water of the state shall apply for and obtain a 401 certification from Ohio EPA.
>
> (B) No person shall engage in an activity requiring a 401 certification prior to obtaining that certification from Ohio EPA.

This current language provides a basis for charging a separate violation; the language at all times relevant to this case, did not. We therefore continue to analyze the charge brought under R.C. 6111.04(A).

{¶44} "Pollution" is defined as "the placing of any sewage, sludge, sludge materials, industrial waste, or other wastes in any waters of the state." R.C. 6111.01(A). "Other wastes" is defined as "garbage, refuse, decayed wood, sawdust, shavings, bark, and other wood debris, lime, sand, ashes, offal, night soil, oil, tar, coal dust, *dredged or fill material*, or silt, other substances that are not sewage, sludge, sludge materials, or industrial waste, and any other 'pollutants' or 'toxic pollutants' as defined in the Federal

16

Water Pollution Control Act that are not sewage, sludge, sludge materials, or industrial waste." R.C. 6111.01(D) (emphasis added). "Dredged material" means "material that is excavated or dredged from waters of the state." OAC 3745-32-01(H) (formerly (E)). At the time appellants conducted their activity in the river, "discharge of dredged material" was recognized only when it was in excess of one cubic yard in a single or incidental operation. *See* former OAC 3745-32-01(C).

{¶45} Thus, it was not a violation of R.C. 6111.04(A) to excavate the East Branch Chagrin River. As pled, appellants are only potentially liable under R.C. 6111.04(A) for the discharge of dredged material into the river and for any other actions constituting pollution, as defined above, because they did not have permits to do so.

{¶46} Appellants are also charged with violating R.C. 6111.07(A) by violating OAC 3745-38-06 and by violating a term or condition of a permit issued by the director. On April 21, 2003, the director issued a General National Pollutant Discharge Elimination System Permit for Storm Water Discharges Associated with Construction Activities ("2003 General Permit"). The 2003 General Permit allows for the discharge of storm water from sites where construction activity is being conducted, as defined in the permit, conditioned upon the payment of applicable fees, submittal of a complete Notice of Intent application form, and written approval of coverage from the director in accordance with OAC 3745-38-06. OAC 3745-38-06(F) provided, at the time of the alleged offenses, that "[f]ailure to submit a notice of intent or request an individual permit will result in an unpermitted discharge subject to enforcement." Under the plain language of this rule, appellants are only potentially liable for the *discharge* of dredged material into the river due to the failure to submit a notice of intent or request an individual permit to do so.

{¶47} The trial court erred to the extent it found appellants liable for activity outside the scope of R.C. 6111.04(A) and R.C. 6111.07(A). Appellants' argument that violations of these sections are the only properly alleged violations is well taken. Appellants are liable under R.C. 6111.04(A) for placing dredged material into the river and in any location where it could cause pollution of the river, because they did not have valid unexpired permits to do so. Appellants are also liable under R.C. 6111.07(A) for violating former OAC 3745-38-06 by failing to submit a notice of intent or request an individual permit prior to discharging dredged material into the river. As pled, they cannot be held liable for excavating the material out of the river.

{¶48} Appellants further assert that the only conduct the trial court should have considered as a violation of R.C. 6111.04(A) is the discharge of dredged materials into the water of the river, not the dredged materials deposited on the river banks. Appellants contend the trial court erred in making a determination that the "waters of the state," as defined in Chapter 6111, include all areas below the "ordinary high water mark." Appellants argue the concept of utilizing the "ordinary high water mark" to define the "waters of the state," thereby including dry land within the "waters of the state," is not supported by statutory or case law. This is, again, a statutory interpretation issue we review de novo. *Reidel*, *supra*, at ¶6.

{¶49} R.C. 6111.01(H) defines "waters of the state" as follows:

> [A]ll streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, and other bodies or accumulations of water, surface and underground, natural or artificial, regardless of the depth of the strata in which underground water is located, that are situated wholly or partly within, or border upon, this state, or are within its jurisdiction, except those private waters that do not combine or effect a junction with natural surface or underground waters.

18

{¶50} The concept of the "ordinary high water mark" was introduced at trial by Edward Wilk, a Section 401 coordinator at the Ohio EPA. Mr. Wilk testified that in determining its jurisdiction, the Ohio EPA utilizes a December 7, 2005 Regulatory Guidance Letter from the U.S. Army Corps of Engineers. The Letter provides that, for purposes of Section 404 of the Clean Water Act, the lateral limits of jurisdiction over non-tidal water bodies, in the absence of adjacent wetlands, extend to the "ordinary high water mark." Corps regulations define the term at 33 CFR 328.3(c)(6) (formerly (e)), which states:

> The term ordinary high water mark means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

{¶51} We are not aware of any case law that holds the area over which the U.S. Army Corps of Engineers has jurisdiction is synonymous with the term "waters of the state" as used in R.C. 6111.04(A). Nor are we aware of any case law interjecting the concept of an ordinary high water mark into the definition of what constitutes "waters of the state." We agree with the State, however, that to accept appellants' argument would be to ignore the purpose of Ohio's Water Pollution Control Act and the problems it intends to remedy. *See, e.g.*, *State v. Conley*, 147 Ohio St. 351, 353 (1947) ("It is fundamental in the construction and application of statutes that not only the purpose to be served, but the object to be attained as well as the evil to be remedied, should be considered."). It defies all sense to conclude that the discharge of pollutants into a portion of a river that

is fortuitously dry at the time of such discharge, but is at other times filled with water, falls outside the rubric of Ohio's Water Pollution Control Act.

{¶52} Further, in determining whether appellants violated R.C. 6111.04(A), it is not necessary to define "waters of the state" in such a way that it equates to or includes the "ordinary high water mark." Again, R.C. 6111.04(A) provides that "[n]o person shall cause pollution *or* place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes *in a location* where they cause pollution of any waters of the state." (Emphasis added.) "Pollution" is defined, in relevant part, as "the placing of * * * other wastes [including dredged material] in any waters of the state." R.C. 6111.01(A)&(D).

{¶53} Thus, pollution, in violation of R.C. 6111.04(A), can occur either directly or indirectly. A direct violation occurs by placing dredged material in a water of the state. An indirect violation occurs by placing, or causing to be placed, dredged material in a location where it then causes pollution of a water of the state.

{¶54} Here, there is evidence that appellants directly caused pollution by placing dredged materials in the river, which is a water of the state. There is also evidence that appellants indirectly caused pollution by placing dredged materials *in a location* that resulted in some of that material ending up in the river, in excess of one cubic yard, either due to storm water runoff or due to the river rising up to the location. It is irrelevant, under the terms of the statute, whether that *location* of placement is above or below any ordinary high water mark.

{¶55} Appellants' argument that the trial court should not have considered the depositing of dredged materials on the river banks is not well taken.

{¶56} Appellants' first assignment of error has merit to the extent indicated. We have no question, as previously discussed, that there were violations of numerous statutory and administrative regulations. For whatever reason, however, the State did not charge appellants with violations of those provisions. Appellants proceeded to trial defending the allegations in the complaint. It would be unfair to require them to defend against violations alleged in letters and administrative orders that were not contained in the complaint filed with the trial court.

{¶57} Appellants' second and third assignments of error state:

> [2.] The trial court erred in assessing a civil penalty against defendants in the amount of $404,200.00.

> [3.] The trial court erred in awarding injunctive relief beyond the scope necessary to address the current effects of dredged materials into the East Branch/Chagrin River, as opposed to, any impact of the overall work performed in the river without a permit.

{¶58} Based on our disposition of the first assignment of error, we must remand this matter to the trial court to make a finding specifically related to the violations alleged in the complaint, to wit: discharge of materials into the East Branch Chagrin River without permits, as provided in R.C. 6111.04(A) and R.C. 6111.07(A), and thereafter limit any civil penalty to the consequences of that conduct and to fashion an order of injunctive relief that addresses only the violations of R.C. 6111.04(A) and R.C. 6111.07(A) as alleged in the complaint. Appellants' second and third assignments of error are therefore unripe at this time.

{¶59} Appellants' fourth assignment of error states:

{¶60} "The trial court erred in finding the Estate of Jerome T. Osborne personally liable."

21

{¶61} Appellants contend in order to find Mr. Osborne personally liable, the State must "pierce the corporate veil."  They assert there was no evidence Mr. Osborne conducted any of the unauthorized activity in his personal, rather than corporate, capacity.

{¶62} The State responds that Ohio law is clear that individuals may be held liable when a court finds "personal participation" in the unlawful act and that it is not necessary to pierce the corporate veil.  The State did not allege in its complaint that Mr. Osborne was responsible as an officer or owner of Osborne Co.  It alleged that Mr. Osborne, individually, violated R.C. 6111.04(A) and R.C. 6111.07(A).  The State contends the plain language of the statute establishes the personal liability of Mr. Osborne.  Appellants argue in response that the State's "personal participation" theory is an attempt to expand its enforcement powers beyond its statutory authority.

{¶63} R.C. 6111.04(A)(1) provides that "no person shall cause" a violation of the statute.  R.C. 6111.07(A) provides that "no person shall violate or fail to perform any duty" under R.C. 6111.01 to R.C. 6111.08.  In the definitions related to this chapter, at R.C. 6111.01(I), the term "person" includes all those set forth in the definition found at R.C. 1.59(C), which defines "person" as including "an individual, corporation, business trust, estate, trust, partnership, and association."

{¶64} The parties stipulated that Osborne Co. is a corporation that has been incorporated under the laws of the state of Ohio since 1956 and is currently in good standing with the Ohio Secretary of State.  Mr. Osborne was an owner and officer of Osborne Co.

{¶65} "A corporation is an artificial person, created by the General Assembly and deriving its power, authority and capacity from the statutes.  * * *  A corporate officer or

shareholder normally will not be held liable for the debts or acts of the corporate entity."

*Mohme v. Deaton*, 12th Dist. Warren No. CA2005-12-133, 2006-Ohio-7042, ¶7, citing

*Worthington City School Dist. Bd. of Educ. v. Franklin Cty. Bd. of Revision*, 85 Ohio St.3d

156, 160 (1999) (citation omitted). "An exception to shareholder liability exists where,

'upon piercing the corporate veil,' it appears that a corporation is simply the 'alter ego' of

the individual sought to be held liable." *Id.* at ¶8, quoting *Inserra v. J.E.M. Bldg. Corp.*,

9th Dist. Medina No. 2973-M, 2000 WL 1729480, *4 (Nov. 22, 2000).

{¶66} "In addition, a corporate officer can be held personally liable for tortious acts

he or she has committed and, under such circumstances, a plaintiff need not pierce the

corporate veil to hold individuals liable who have personally committed such acts." *Id.* at

¶9 (citations omitted). This has become known as the "personal participation" theory and

has been applied to environmental law violations. *See, e.g., State ex rel. DeWine v.*

*Sugar*, 7th Dist. Jefferson Nos. 14 JE 0004 & 14 JE 0006, 2016-Ohio-884, ¶35 (citation

omitted); *State ex rel. DeWine v. Marietta Indus. Enters., Inc.*, 4th Dist. Washington No.

15CA33, 2016-Ohio-7850, ¶25.

{¶67} "A corporate officer, however, 'may not be held liable merely by virtue of his

status as a corporate officer.'" *Roberts v. RMB Ents., Inc.*, 197 Ohio App.3d 435, 2011-

Ohio-6223, ¶35 (12th Dist.), quoting *Mohme, supra*, at ¶28. Rather, the evidence

presented must indicate that the officer specifically directed the particular act to be done

or that the officer participated or cooperated therein. *Id.*, citing *Young v. Featherstone*

*Motors, Inc.*, 97 Ohio App. 158, 171 (1954); *see also Marietta, supra*, at ¶25 (citations

omitted).

{¶68} The parties stipulated that Mr. Franz was employed by Mr. Osborne through Osborne Co. since 1991. It was also stipulated that Mr. Osborne directed Mr. Franz to remove material from the stream bed and place it along the edge of the river, on the river banks, and in the middle of the river and that Mr. Osborne personally observed some of this work. The parties further stipulated that Mr. Osborne usually called Mr. Franz the night before or first thing in the morning to instruct him what project to work on each day and what to do for each project, and that Mr. Osborne would usually call Mr. Franz at night to see how the work for the day went. Notably, the stipulations also include the following:

> Defendants performed the work on the East Branch Chagrin River pursuant to April 1983 and June 1990 Agreements with the Village of Kirtland Hills to maintain the river banks. * * * In exchange for the work performed on the East Branch Chagrin River pursuant to the April 19, 1983 Agreement, *Defendant Jerome T. Osborne* was allowed to farm certain property owned by the Village of Kirtland Hills. [Emphasis added.]

{¶69} Thus, there is evidence that a personal benefit was conferred on Mr. Osborne and that he acted independent of the corporation, at least to some degree. The record does not contain any evidence that he was acting, at all times material, only in his corporate capacity. The State alleged Mr. Osborne personally violated the statute. The fact that he may have been acting in his corporate capacity is a defense to that claim—a defense that was not established in the record.

{¶70} In light of the stipulations and evidence presented, we agree that Mr. Osborne's personal participation in the violations has been established by a preponderance of the evidence. The trial court did not err in finding Mr. Osborne's Estate jointly and severally liable along with Osborne Co.

24

**{¶71}** Appellants' fourth assignment of error is without merit.

**{¶72}** The judgment of the Lake County Court of Common Pleas is affirmed with regard to holding appellants jointly and severally liable. The judgment is reversed with regard to the finding of liability for activity outside the scope of R.C. 6111.04(A) and R.C. 6111.07(A). This matter is remanded for the trial court to make a finding specifically related to the violations alleged in the complaint and thereafter limit any civil penalty and injunctive relief to the consequences of that conduct.

DIANE V. GRENDELL, J., concurs with a Concurring Opinion,
COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____

DIANE V. GRENDELL, J., concurs with a Concurring Opinion.

**{¶73}** I concur in the decision to reverse the trial court's judgment and remand this matter for a proper determination of damages based on the alleged violations of R.C. 6111.04(A) and 6111.07(A) contained in the complaint, i.e., the "discharge of materials into the East Branch Chagrin River." *Supra* at ¶ 58. It is evident from the trial court's judgment that its determination of the appellants' liability relied heavily on the dredging of the stream channel rather than the discharge of materials. *See, e.g.,* "Anderson testified that the dredging activities significantly degraded fish and macro invertebrate habitat"; "[t]he dredging throughout the river resulted in a loss of riffles, pools and bank vegetation"; and "significant adverse changes in the morphology and habitat of the river were caused by the dredging." July 29, 2016 Opinion and Judgment Entry, at 12, 16, and 18.

25

{¶74} I would also point out the trial court, in its consideration of damages, noted that the appellants "chose not to settle at the administrative level" and, "unlike the Village of Kirtland Hills, * * * did not agree to measures to remediate the river," and also "obtained an economic benefit from being able to farm the extensive lands owned by the Village of Kirtland Hills." Opinion and Judgment Entry, at 19. The import of these findings is compromised by the fact that the appellants were willing to adopt measures to remediate the river if the State would have been willing to waive the right to seek civil penalties as it had done for the Village of Kirtland Hills. The State's failure to make this concession has not been satisfactorily explained, particularly given that all the appellants' dredging activity was done at the behest of the Village. With respect to the economic benefit derived by the appellants, this literally consisted of grass for consumption by appellants' horses. There is little in the record to support a finding of bad faith or self-interest on the part of the appellants.

{¶75} Accordingly, I concur in the judgment and opinion of this court.

_____

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶76} I would uphold the trial court's order in its entirety. As such, I respectfully dissent.