[Cite as *State ex rel. Yost v. Osborne Co., Ltd.*, 2020-Ohio-3090.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO ex rel. DAVE YOST, OHIO ATTORNEY GENERAL, | : | **O P I N I O N** |
| | : | |
| Plaintiff-Appellee, | : | **CASE NO. 2019-L-003** |
| | : | |
| - vs - | : | |
| | : | |
| OSBORNE CO., LTD., et al., | : | |
| | : | |
| Defendants-Appellants. | | |

Civil Appeal from the Lake County Court of Common Pleas, Case No. 2014 CV 000166.

Judgment: Affirmed in part and reversed in part; remanded.


*Dave Yost*, Ohio Attorney General; *Gregg H. Bachmann* and *Catherine A. English*, Assistant Attorneys General, Environmental Enforcement Section, 30 East Broad Street, 25th Floor, Columbus, OH 43215 (For Plaintiff-Appellee).

*Richard N. Selby, II* and *Grant J. Keating*, Dworken & Bernstein Co., LPA, 60 South Park Place, Painesville, OH 44077 (For Defendants-Appellants).


TIMOTHY P. CANNON, P.J.

{¶1} Appellants, Osborne Co., Ltd. and the Executors of the Estate of Jerome T. Osborne (collectively "appellants"), appeal from a December 17, 2018 judgment of the Lake County Court of Common Pleas. Following remand from this court, the trial court modified its original order. The court ordered appellants to pay a civil penalty for violations of Ohio Revised Code Chapter 6111 and ordered injunctive relief in favor of

appellee, the Ohio Attorney General.  This judgment is affirmed in part and reversed in part, and the matter is remanded for further proceedings.

## Procedural History

{¶2}   The Attorney General filed two complaints in 2012 and 2014, which were later consolidated, against Jerome T. Osborne ("Mr. Osborne")[1] and Osborne Co., Ltd. ("Osborne Co.") (collectively "defendants").  The complaints set forth three causes of action, each alleging violations of Ohio's Water Pollution Control Laws as found in Revised Code Chapter 6111.

{¶3}   Count One alleged defendants violated R.C. 6111.04(A) and R.C. 6111.07(A) by failing to obtain a certification from the Ohio Environmental Protection Agency ("Ohio EPA") under Section 401 of the Clean Water Act or a Section 404 permit from the U.S. Army Corps of Engineers before engaging in certain activities within and along the East Branch Chagrin River.  These activities allegedly resulted in "(1) the placement of dredged or fill material and/or wastes into waters of the State; and (2) degradation of certain portions of the East Branch Chagrin River and the threatened degradation of other portions [of] these waters of the state."

{¶4}   Count Two alleged defendants violated R.C. 6111.04(A) and R.C. 6111.07(A) by failing to obtain a construction storm water discharge permit before engaging in construction activities that resulted in "disturbing one or more acres of land within and along two miles of stream channel of the East Branch Chagrin River."

{¶5}   Count Three alleged defendants violated R.C. 6111.04(A) and R.C. 6111.07(A) because they polluted the East Branch Chagrin River, without a permit, by

---

1. Following the death of Mr. Osborne, the executors of his estate were substituted as party defendants.

2

discharging storm water from land within and along two miles of stream channel of the East Branch Chagrin River, and thereby created a public nuisance.

{¶6} The parties submitted a joint stipulation of facts with regard to many issues in the case. The case ultimately proceeded to a bench trial in January 2016 on the remaining disputed facts.

{¶7} This matter arose after an employee of the Ohio EPA observed William Franz, an employee of Osborne Co., operating a track hoe in the middle of the East Branch Chagrin River. In his deposition, Mr. Franz testified that he was removing silt so the river would flow. The parties stipulated that Mr. Osborne instructed Mr. Franz to use the track hoe to remove sand and gravel from the stream bed and to relocate this material along the edge of the stream, on the stream banks, and in the middle of the river. The parties also stipulated that, on certain occasions when the track hoe's bucket could not reach the river bank, Mr. Franz would place piles in the river, then relocate the track hoe and move those piles to the bank of the river. Another stipulation was that Mr. Osborne personally observed some of Mr. Franz's work and would usually call Mr. Franz the night before or first thing in the morning to tell him what project to work on each day and what to do for the project. After work was completed, Mr. Osborne would usually call Mr. Franz to ask how the work for the day went.

{¶8} The parties stipulated that defendants were performing the work on the river pursuant to agreements with the Village of Kirtland Hills ("the Village"), reached in 1983 and 1990, to maintain the river banks. In exchange for the work performed on the river, Mr. Osborne was allowed to farm certain property owned by the Village. The work

3

was done throughout the years from River Mile 4.30 to River Mile 6.15.[2]  Most of the work performed in or near the river was on property owned either by the Village or Mr. Osborne.

{¶9}    The parties stipulated that the East Branch Chagrin River is a "water of the state," as that term is defined in R.C. 6111.01; it was designated a State Scenic River by the Ohio Department of Natural Resources ("ODNR") on July 2, 1979; it is designated an Outstanding State Water for Ecological Value; and its beneficial use designations are cold water habitat,[3] seasonal salmonid habitat, primary contact recreation, and agricultural/industrial water supply.

{¶10} The parties stipulated that Mr. Franz, at the direction of Mr. Osborne, operated the track hoe in the river on 24 separate occasions from 2001 through 2007. Each of these occasions involved dredging the river and placing dredged material along the river bank or in the middle of the river.  Evidence was introduced that the dredged material formed nine piles, anywhere from eight- to twenty-feet high, for extended distances along the river bank.  At least 25,656 cubic yards of river bottom were dredged.  Most of the dredged material was piled on property owned by either the Village or Mr. Osborne.  One pile, referred to as "the Oliva pile," was located on private property near St. Hubert's church in the Village.

{¶11} The river had been excavated down to the bedrock and the dredged material piled in many areas between R.M. 4.30 and R.M. 6.15, which resulted in the

---

2. A "river mile" is similar to a mile marker on a highway.  Here, it is measured by the distance from Lake Erie (R.M. 0) to the source of the river.  R.M. 6.15 is upstream of R.M. 4.30 and is just upstream of St. Hubert's Church, located at 8870 Baldwin Road in the Village.  R.M. 4.30 is near the western boundary of property owned by the Village.

3. According to trial testimony, Ohio cold water streams are generally small and have small drainage systems.  A cold water stream such as the East Branch Chagrin River is unique due to its size and provides a large cold water habitat the state of Ohio seeks to preserve.

4

river losing access to its floodplain and caused significant bank erosion. The state also introduced testimony that defendants' activities resulted in a loss or degradation of the habitat for fish and macroinvertebrates.

{¶12} Paul Anderson, an environmental specialist in the surface water division of the Ohio EPA, became aware of the work being done in the river on July 13, 2007, at which time the Ohio EPA ordered defendants to cease work in the river. Defendants complied. The Ohio EPA immediately performed a site survey and concluded the site was severely impacted by substrate removal and reworking, as well as by placement of removed material in the floodplain and bankfull area:[4] the habitat was severely simplified, siltation was high, and erosion was potentially high.

{¶13} The U.S. Army Corps of Engineers ("the Corps") thoroughly inspected the river one week later. The parties stipulated that Mr. Osborne received a letter from the Corps in August 2007, stating the work in the river was an unauthorized activity and in violation of the Federal Clean Water Act. The letter stated, in part:

> The inspection found that gravel and natural stone were excessively dredged from the stream at several locations, and disposed or stockpiled in the floodway and below the ordinary high water elevation, and also in the stream channel. No Department of the Army authorization was issued for this activity. Therefore, this work is an unauthorized activity and in violation of the Clean Water Act.

The letter directed Mr. Osborne not to perform any additional activities in the river and advised that any further work would be considered a knowing and willful violation of federal law, subjecting him to civil penalties.

---

4. The "bankfull area" is that portion of the stream channel large enough to contain the stream under most flow conditions. The floodplain lies above the bankfull area. This area is either bare or has aquatic and annual vegetation; perennial vegetation cannot grow here because the roots are too wet or the seedlings get swept away.

{¶14} The parties stipulated that Mr. Osborne also received a notice of violation from the Ohio EPA in August 2007, alleging violations of Ohio Revised Code Chapter 6111. The notice additionally alleged violations of Ohio Administrative Code section 3745-1-04. This notice stated, in relevant part:

> The illegal activity began upstream of St. Hubert's Church on the East Branch of the Chagrin River and continued downstream approximately 8,700 feet. The inspection team observed that materials had been and were being side cast from the river bed onto various sections of the river bank. This activity constitutes a violation of [R.C.] 6111.04, which prohibits any person from causing pollution to any waters of the State without a valid unexpired permit issued by the Director of Ohio EPA. [R.C.] 6111.07 states that no person shall violate or fail to perform any duty imposed by rules adopted by Ohio EPA. The activities observed caused violations of [OAC] 3745-1-04, which contains criteria applicable to all waters of the State. Please be advised that failure to comply with the above laws may be cause for enforcement action pursuant to [R.C.] Section 6111 and subject you to civil penalties identified in [R.C.] 6111.09(A).
>
> Please inform this office in writing, within ten days of receipt of this notification, of the description of the action(s) proposed to address these violations. Please provide all documentation associated with this activity including the intent of the activity, contracts with others to perform the activity, and a record of when this activity had been previously performed.

{¶15} Mr. Osborne responded by letter, through his attorney, on September 10, 2007. Mr. Osborne noted he began utilizing the land located in the Village pursuant to an oral agreement with the Village in the late 1970s. This oral agreement was confirmed by written agreements in 1983 and 1990. Pursuant to these agreements, Mr. Osborne undertook erosion control and bank stabilization measures on the property on an intermittent basis. He indicated there were no records or documentation associated with said erosion control and bank stabilization measures. Mr. Osborne did not propose any actions to address the alleged violations. The letter ended with a statement that Mr.

6

Osborne denied any unlawful activities and that nothing in the letter shall be deemed an admission as to any unlawful activities.

{¶16} On November 1, 2007, Randall Keitz, a floodplain engineer with ODNR, surveyed the disturbed area of the river. He concluded that the river was highly unstable with considerable ongoing erosion of the river banks due to the limited channel width and increased velocity of the water. Trees along the banks were being undermined, and access to the floodplain was very limited.

{¶17} On November 2, 2007, the Corps sent a letter to the director of the Ohio EPA, noting the work was done without authorization and in violation of the Clean Water Act. It authorized the Ohio EPA to immediately begin remedial and restoration measures without needing to obtain any further approval or permits from the Corps.

{¶18} Over the next two years, the Ohio EPA met with Mr. Osborne and the Village to negotiate remediation of the river. On April 29, 2009, the Ohio EPA provided a proposed draft of a settlement, titled "Director's Final Findings and Orders," to defendants in an attempt to administratively settle the alleged violations of R.C. Chapter 6111. The draft states, in Paragraph 3 of the Findings, that defendants altered approximately two miles of the stream channel in violation of R.C. Chapter 6111 and the Clean Water Act by dredging from and depositing fill material in the river. Paragraph 8 states that constriction of the floodplain remains a significant concern: lowering of the stream channel elevation and stockpiling of material along the stream banks significantly limits the amount of energy dissipation that can occur during flood events. Paragraphs 9 and 10 state that placement of dredged substrates directly upon the stream bank has increased the risk of flood damage and that lowering of the channel bed has caused bank erosion problems. Paragraph 11 states the river is not meeting

certain biocriteria outlined in OAC 3745-1-07 due to habitat modification and disturbance.

{¶19} The draft then outlines several Orders directing defendants to implement a plan designed to fully remediate the river. It states that "[t]he Plan shall focus on facilitating the natural recovery of the river. Where appropriate, the plan may include replacement of the stockpiled substrates within the stream channel to provide enhanced habitat, to expedite the stream channel recovery process or to stabilize streambanks at specified locations."

{¶20} A section of the draft, titled "Reservation of Rights," provides, in part:

> Ohio EPA reserves the right to take any action, including but not limited to any enforcement action for civil or administrative penalties against Respondent for violations specifically cited in these Orders, action to recover costs, or action to recover damages to natural resources, action to compel further remediation pursuant to any available legal authority as a result of past, present, or future violations of state or federal laws or regulations or the common law, and/or as a result of events or conditions arising from, or related to, the Site. Upon termination pursuant to the Termination Section of these Orders, Respondent shall have resolved their liability to Ohio EPA only for the Work performed pursuant to these Orders.

{¶21} Larry Reeder, enforcement supervisor of the surface water division, testified that the Ohio EPA did not intend to pursue a civil penalty against defendants at the time they were negotiating. Cynthia Paschke also testified regarding these negotiations. Ms. Paschke represented defendants during their negotiations with the Ohio EPA. She was also qualified as an expert witness, limited to the collection and analysis of habitat data in the river. Ms. Paschke testified that defendants were prepared to move forward with the negotiated restoration project had the Ohio EPA waived its reservation of rights regarding the enforcement of future administrative and civil penalties, as it had done with the Village. The Ohio EPA did not, however, waive

8

its reservation of rights with respect to defendants. Mr. Reeder testified he was notified in May 2009 that, as a result, defendants would not sign the draft agreement and would not move forward with the restoration project. On June 25, 2009, the director of the Ohio EPA requested in writing that the Ohio Attorney General initiate civil proceedings against defendants.

{¶22} On July 27, 2009, the Village signed a settlement agreement with the Ohio EPA (i.e., the final version of the Director's Final Findings and Orders). The "Reservation of Rights" section of this agreement with the Village, Section XI, simply provided that the "Ohio EPA and Respondent each reserve all rights, privileges and causes of action, except as specifically waived in Section XI of these Orders." Mr. Reeder testified that the Ohio EPA was not seeking a financial penalty against the Village.

{¶23} The Village agreed, in part, to do the following: (1) remove the piles placed on the floodplain and redistribute the material into and along the river channel; (2) develop a plan to construct bank stabilization, where appropriate, to reduce bank erosion and stress; (3) develop a plan to re-vegetate exposed areas following excavation and construction activities; (4) develop a plan for storm water pollution prevention; (5) provide a schedule for implementing the plans and submitting reports to the Ohio EPA; (6) submit a plan to monitor river channel morphology, habitat quality, and biological water quality; and (7) submit a plan for the creation of a riparian buffer along the river that provides for permanent protection through a conservation easement or an environmental covenant.

{¶24} The Village hired Oxbow River and Stream Restoration, Inc. ("Oxbow") to perform the remedial work in the river. In January 2011, Oxbow developed a storm

water pollution prevention plan, a stream restoration plan, and a stream restoration project summary of work. The remediation work outlined in the settlement agreement was largely completed by November 2013. Oxbow had redistributed approximately 25,000 cubic yards of previously dredged material into approximately 5,260 linear feet of active channel; stabilized approximately 1,240 feet of stream bank; and planted native grasses, sedges, shrubs, and trees on approximately 11.5 acres of land. Mr. Anderson testified that the river bed had been raised one to two feet in most locations, which improved access to the floodplain. The Oliva pile, however, was not removed and redistributed; apparently, the Village refused to authorize work on property not under its control.

{¶25} William Zawiski, a water quality supervisor with the Ohio EPA, testified that he conducted a habitat evaluation on November 19, 2013. The restoration work had improved the habitat, but the river had not fully recovered from the unauthorized activities: the river still needed more cover and pools.

{¶26} Mr. Keitz testified that he conducted a stream channel classification survey in December 2013. The river remained moderately entrenched and could barely reach its floodplain; it remained highly unstable with no bank protection. He recommended planting trees and other vegetation to stabilize the banks and further raising the bed, by adding rocks and other material, to slow river velocity and create habitats.

{¶27} The parties submitted post-trial briefs at the conclusion of the bench trial. Defendants restated the defenses they had raised at various stages throughout litigation. First, defendants argued the statutory framework under which the complaint was brought (R.C. 6111.04 & R.C. 6111.07) does not prohibit dredging; thus, the only

10

alleged violations at issue related to the unauthorized discharge of dredged materials into the river. Second, defendants argued the statutes at issue do not require one to obtain a permit; rather, obtaining a permit "provides a safe harbor, whereby individuals or companies who obtain a permit are exempted from these pollution laws." With regard to the imposition of a civil penalty, defendants argued the Attorney General had mischaracterized their failure to perform any remediation on the river as a result of recalcitrance, instead of recognizing it as a result of the Ohio EPA's refusal to waive civil penalties.

{¶28} On August 1, 2016, the trial court found in favor of the Attorney General on all three counts.

{¶29} Regarding Count One—which alleged defendants violated R.C. 6111.04(A) and R.C. 6111.07(A) by failing to obtain Section 401 and Section 404 permits prior to commencing work in the river—the trial court found defendants' activities along the East Branch Chagrin River resulted in the placement of dredged material in the river in excess of one cubic yard, thus triggering the requirement to obtain the permits.

{¶30} Regarding Count Two—which alleged defendants violated R.C. 6111.04(A) and R.C. 6111.07(A) by failing to obtain a construction storm water discharge permit before engaging in construction activities—the trial court found the Attorney General had shown that defendants disturbed one or more acres of land along the East Branch Chagrin River, thus triggering the requirement to obtain the permit. The trial court stated defendants' claim that the permitting process merely provides a safe harbor exemption from Ohio's water pollution laws has no basis in law.

11

{¶31} Regarding Count Three—which alleged defendants violated R.C. 6111.04(A) and R.C. 6111.07(A) because they polluted the river by discharging storm water from land within and along two miles of stream channel of the river—the trial court stated it was closely related to Counts One and Two and, "[a]pplying the factors and analysis applied in count two," it found in favor of the Attorney General.

{¶32} In addition, the trial court found Mr. Osborne was subject to personal liability on all three counts and therefore held his Estate jointly and severally liable along with Osborne Co.

{¶33} The trial court found that (1) significant harm to the river environment was caused by defendants' dredging; (2) defendants were aware of the requirement to at least obtain a National Pollutant Discharge Elimination System permit, but failed to do so; (3) defendants avoided the costs of various permits and obtained an economic benefit from farming the land owned by the Village; and (4) the Attorney General incurred extraordinary enforcement costs. As a result, the trial court imposed a civil penalty of $404,240.00, plus post-judgment statutory interest. This amount consisted of "$180,000 for 24 days of active dredging * * * with each day being assessed a $7,500 penalty"; "$184,080 for creating a public nuisance by leaving spoil piles along the river * * * for a total of 2,301 days at $80 per day"; and "$40,160 for creating a public nuisance by allowing the remaining spoil pile to exist * * * for a total of 1,004 days at $40 per day."

{¶34} The trial court also ordered extensive injunctive relief, as follows:

(A) Defendants are permanently enjoined from discharging any pollution, other wastes, and dredge and fill material to waters of the State on or from the banks of the East Branch Chagrin River except in compliance with Chapter 6111 and any necessary permits and/or Section 401 certifications issued pursuant to Chapter 6111 and the rules adopted thereunder;

12

(B) Defendants shall submit a plan to the Ohio EPA to redistribute and/or remove the remaining pile [the Oliva pile] in the East Branch Chagrin River within ninety days from the date of this judgment entry;

(C) Defendants shall implement and execute the approved redistribution and/or removal plan;

(D) Defendants shall submit a monitoring plan to characterize the current channel morphology, habitat quality, and biological water quality in the East Branch Chagrin River within ninety days from the date of this judgment entry;

(E) Defendants shall implement and execute the approved monitoring plan;

(F) Defendants shall submit a plan for the creation of a riparian buffer along the East Branch Chagrin River to bar construction activities and stream channel modifications except as authorized by the Ohio EPA within one hundred and twenty (120) days from the date of this judgment entry;

(G) Defendants shall implement and execute the approved riparian buffer plan; and

(H) Defendants shall submit a post-construction report to the Ohio EPA after completion of the remediation work and creation of the riparian buffer.

### First Appeal

{¶35} Appellants noticed an appeal from this entry. On appeal, this court affirmed the trial court's decision to hold defendants jointly and severally liable. We determined, however, that the complaint only alleged violations of R.C. 6111.04(A) and R.C. 6111.07. While it may have been a violation of another statute or administrative code provision to excavate the East Branch Chagrin River, it was not a violation of R.C. 6111.04(A). Thus, we reversed the trial court's judgment with regard to the finding of liability for activity outside the scope of R.C. 6111.04(A) and R.C. 6111.07(A). *State ex rel. DeWine v. Osborne Co., Ltd.*, 11th Dist. Lake No. 2016-L-091, 2018-Ohio-3109.

13

{¶36} As pled, defendants were only liable under R.C. 6111.04(A) for placing dredged material into the river and in any location where it could cause pollution of the river, because they did not have valid unexpired permits to do so. Defendants were also liable under R.C. 6111.07(A) for violating former OAC 3745-38-06 by failing to submit a notice of intent and failing to request an individual permit prior to discharging dredged material into the river. The matter was remanded for the trial court to make a finding specifically related to the violations alleged in the complaint and thereafter limit any civil penalty and injunctive relief to the consequences of that conduct. *Osborne*, *supra*, at ¶72.

### Proceedings following Remand

{¶37} On remand, the parties submitted memorandums, and the trial court issued its final order on December 17, 2018. Pursuant to this court's remand order, the trial court only considered its findings from the 2016 order that related to placing dredged material into the river and any location where it could cause pollution without valid permits to do so. It incorporated those findings into the 2018 order. Accordingly, the trial court vacated the $180,000.00 civil penalty previously imposed for 24 days of actively dredging the river.

{¶38} The trial court held that the remaining civil penalties for violations of R.C. 6111.04(A) and R.C. 6111.07(A) remained valid, to wit: (1) $184,080.00 for creating a public nuisance by leaving spoil piles (piles A-H) along the river for 2,301 days, at $80.00 per day, from July 13, 2007, to November 1, 2013 (the date the Village completed its portion of remediation); and (2) $40,160.00 for creating a public nuisance by allowing the remaining spoil pile (the Oliva pile) to exist for 1,004 days, at $40.00 per

day, from November 2, 2013, to July 29, 2016. Thus, the total civil penalty imposed upon appellants was $224,240.00.

{¶39} The trial court also modified the order of injunctive relief by vacating sections (D), (E), (F), and (G) of its prior entry. It stated sections (A), (B), (C), and (H) remained valid, and they were renumbered in the trial court's final order as follows:

> (1) Defendants Osborne Co., Ltd. and Estate of Jerome T. Osborne are permanently enjoined from discharging any pollution, other wastes, and dredge and fill material into waters of the State on or from the banks of the East Branch Chagrin River except in compliance with Chapter 6111 and any necessary permits and/or Section 401 certifications issued pursuant to Chapter 6111 and the rules adopted thereunder;
>
> (2) Defendants Osborne Co., Ltd. and Estate of Jerome T. Osborne shall submit a plan to the Ohio EPA to redistribute and/or remove the remaining pile (Oliva) in the East Branch Chagrin River within ninety (90) days from the date of this Opinion and Judgment Entry;
>
> (3) Defendants Osborne Co., Ltd. and Estate of Jerome T. Osborne shall implement and execute the approved redistribution and/or removal plan;
>
> (4) Defendants Osborne Co., Ltd. and Estate of Jerome T. Osborne shall submit a post-construction report to the Ohio EPA after completion of the redistribution and/or removal work.

{¶40} The trial court retained jurisdiction over the case for the purpose of making any order or decree it deems necessary, at any time, to enforce and administer appellants' compliance with the terms and provisions of the court's orders or decrees.

{¶41} Appellants filed a timely appeal from the trial court's final order. They assert two assignments of error, which we consider in reverse order:

> [1.] The trial court erred in assessing a civil penalty against defendants in the amount of $224,240.00.
>
> [2.] The trial court erred in requiring defendants to remove the Oliva pile.

15

**Injunctive Relief**

{¶42} Appellants present two issues for review under their second assignment of error, in which they argue the trial court erred in ordering them to remove the Oliva pile.

{¶43} First, appellants assert "the State of Ohio failed to introduce evidence demonstrating that the Oliva pile has resulted in the discharge of pollution into the East Branch Chagrin River." Their argument is that the state did not introduce *any* evidence in this regard, which raises a question of sufficiency.

{¶44} Sufficiency of the evidence is ""a term of art meaning that legal standard which is applied to determine whether the case may go to the [trier of fact] or whether the evidence is legally sufficient to support the * * * verdict as a matter of law."" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id.*, quoting *Thompkins*, *supra*, at 386. Thus, appellate review is de novo.

{¶45} Defendants were charged, in part, with violating R.C. 6111.07(A) by violating R.C. 6111.04(A), which provides: "(1) No person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state." Any such action is declared to be a public nuisance, except in cases where the director has issued a valid and unexpired permit or renewal thereof, as provided in R.C. 6111.01 to R.C. 6111.08. *See Osborne*, *supra*, at ¶41.

{¶46} "Pollution" is defined as "the placing of any sewage, sludge, sludge materials, industrial waste, or other wastes in any waters of the state." R.C. 6111.01(A).

16

"Other wastes" is defined as "garbage, refuse, decayed wood, sawdust, shavings, bark, and other wood debris, lime, sand, ashes, offal, night soil, oil, tar, coal dust, *dredged or fill material*, or silt, other substances that are not sewage, sludge, sludge materials, or industrial waste, and any other 'pollutants' or 'toxic pollutants' as defined in the Federal Water Pollution Control Act that are not sewage, sludge, sludge materials, or industrial waste." R.C. 6111.01(D) (emphasis added). "Dredged material" means "material that is excavated or dredged from waters of the state." OAC 3745-32-01(H) (formerly (E)). At the time defendants conducted the activity in the river, "discharge of dredged material" was recognized only when it was in excess of one cubic yard in a single or incidental operation. *See* former OAC 3745-32-01(C).

{¶47} Thus, in the first appeal, we held that defendants "are liable under R.C. 6111.04(A) for placing dredged material into the river and in any location where it could cause pollution of the river, because they did not have valid unexpired permits to do so." *Osborne, supra*, at ¶47.

{¶48} Defendants placed the dredged materials either in the river or along the river bank. All nine piles (piles A-H and the Oliva pile) came to rest along the river bank, in the floodway, or in the stream channel. The state presented evidence that the location of those piles resulted in some of that dredged material ending up in the river, in excess of one cubic yard, either due to storm water runoff or due to the river rising up to the location. The Oliva pile was treated no differently with regard to this evidence—it is named differently simply because of its location on property that is not owned by the Village or Mr. Osborne.

{¶49} There was additional evidence presented that the Oliva pile is causing extensive erosion at the St. Hubert's Church property by blocking the river's access to

17

its floodplain and focusing energy in the river toward the church. As maintained by the state in its appellate brief, it defies all logic to suggest that these effects to the topography occur without a portion of the Oliva pile actually ending up in the river at certain times. Further, as we stated in our previous opinion, "[i]t defies all sense to conclude that the discharge of pollutants into a portion of a river that is fortuitously dry at the time of such discharge, but is at other times filled with water, falls outside the rubric of Ohio's Water Pollution Control Act." *Osborne, supra*, at ¶51.

{¶50} Appellants' argument is not well taken. Sufficient evidence was presented to support the trial court's finding that the Oliva pile is part of defendants' R.C. 6111.04(A) violation.

{¶51} In their second issue for review, appellants assert the trial court "does not have jurisdiction to unconditionally order Defendants to do work on the Oliva Family's property." The trial court did not, however, unconditionally order appellants to do work on the Oliva Family's property. Rather, the trial court ordered appellants to "submit a plan to the Ohio EPA to redistribute and/or remove the remaining pile (Oliva) in the East Branch Chagrin River within ninety (90) days from the date of this Opinion and Judgment Entry." Ostensibly, any sensible plan would include obtaining—or reasonably attempting to obtain—permission from those persons who own or control the Oliva property for appellants to enter the property and redistribute or remove the remaining pile as approved by the Ohio EPA. This issue is not well taken.

{¶52} Appellants' second assignment of error is without merit.

### Civil Penalty

{¶53} Under their first assignment of error, in which they argue the trial court erred in assessing a civil penalty, appellants also present two issues for review. The

18

first issue asserts "the Trial Court failed to address the issues raised by [the concurring judge] in her concurring opinion from the first appeal."

{¶54} The statement of the issue, as written, is not well taken. A concurring opinion may be considered persuasive by a lower court, but it has no precedential value; it is merely an expression of a concurring judge's personal view of the law, the facts, or the application of either. Further, as the lead opinion in the first appeal did not reach the issue of the civil penalty, the concurring judge's views on that matter were advisory and obiter dicta. *See State ex rel. Gordon v. Barthalow*, 150 Ohio St. 499, 505-506 (1948) (quotation omitted) (defining obiter dictum as "an incidental and collateral opinion uttered by a judge, and therefore (as not material to his decision or judgment) not binding. * * * Hence, any incidental remark, reflection, comment, or the like.").

{¶55} The substance of appellants' issue, however, goes beyond the fact that it was mentioned in the concurring judge's opinion. Appellants assert the trial court essentially penalized them for refusing to settle with the Ohio EPA.

{¶56} The trial court found that the "Defendants chose not to settle at the administrative level nor after the start of litigation, forcing the state to incur substantial enforcement costs and delaying further remedial work on the river."

{¶57} Appellants argue this finding does not justify imposition of a civil penalty, because the Attorney General never explained why the concession on civil penalties was made to the Village, but not to the defendants, during settlement negotiations. Appellants offer no case law to support this position. That the Attorney General exercised its discretion not to enforce a civil penalty against the Village (a political subdivision) is not a defense to the trial court's imposition of a civil penalty against

19

defendants. Even though the Village also contributed to the violations, it incurred costs in performing the remediation work in the river. Although the amount of expense incurred by the Village is not clear from the record, it appears the expense was significant.

{¶58} Appellants also argue they should not be punished for their good faith efforts to defend themselves against overreaching claims by the Ohio EPA and the Attorney General. They essentially argue that this court's opinion in the first appeal establishes justification for their failure to settle. To the contrary, nothing in the record supports the allegation that the Ohio EPA or the Attorney General overreached during settlement negotiations. Certainly, this court's opinion in the first appeal does not support this allegation. The complaint simply did not allege violations for excavations from the river, even though it is clear those violations did occur. We addressed the insufficiency of the complaint with regard to certain violations; we did not say those violations never occurred.

{¶59} The first issue presented by appellants is not well taken.

{¶60} Appellants' second issue asserts "the Trial Court did not properly apply the factors relevant to assessing a civil penalty." With this, we agree in part.

{¶61} "Assessing an environmental civil penalty lies within the trial court's discretion. As long as the amount assessed is less than the statutory maximum, it is within the trial court's discretion to fix that amount." *State ex rel. DeWine v. Deer Lake Mobile Park, Inc.,* 11th Dist. Geauga No. 2013-G-3156, 2015-Ohio-1060, ¶41, citing *State ex rel. Ohio Atty. Gen. v. Shelly Holding Co.*, 135 Ohio St.3d 65, 2012-Ohio-5700, ¶23 and *State ex rel. Brown v. Dayton Malleable, Inc.*, 1 Ohio St.3d 151, 157-158 (1982). Thus, this court will not reverse the amount of the civil penalty imposed absent

20

an abuse of the trial court's discretion. An abuse of discretion occurs when a trial court fails to "'exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶61, quoting *Black's Law Dictionary* (8th Ed.2004) 11; *see also Dayton Malleable*, *supra*, at 157 (a trial court abuses its discretion by assessing a penalty that is "unreasonable, arbitrary, or unconscionable").

{¶62} "The General Assembly intended to use economic sanctions to deter violations of R.C. Chapters 6109 and 6111, and thereby to promote the goal of clean water in the state of Ohio, when it provided for substantial monetary penalties." *Deer Lake*, *supra*, at ¶42, citing *Dayton Malleable*, *supra*, at 157. Specifically, "[a]ny person who violates section 6111.07 of the Revised Code shall pay a civil penalty of not more than ten thousand dollars per day of violation." R.C. 6111.09(A).

{¶63} It is undisputed that piles of dredged material remained along the East Branch Chagrin River from July 13, 2007, to November 1, 2013 (the date the Village completed its remediation efforts), for a total of 2,301 days. It is also undisputed that the Oliva pile continued to exist after the Village completed its portion of remediation; 1,004 days passed from November 2, 2013, until July 29, 2016 (the date of the trial court's first order). The maximum potential civil penalty for 3,305 days in violation of R.C. 6111.07(A), at $10,000.00 per day, is in excess of $33 million. The trial court assessed a penalty of $80.00 per day for the first 2,301 days and $40.00 per day for the remaining 1,004 days, which resulted in a total civil penalty of $224,240.00—far less than the statutory maximum.

{¶64} In making this determination, the trial court applied the factors set forth by the Supreme Court of Ohio in its *Dayton Malleable* opinion. We note that while a trial court may apply these factors in assessing a civil penalty, it is not statutorily required to

21

do so. *See Deer Lake*, *supra*, at ¶44, citing *Mentor v. Nozik*, 85 Ohio App.3d 490, 494 (11th Dist.1993). The factors are "(1) the harm or risk of harm posed to the environment by the violations, (2) the violator's level of recalcitrance, defiance, or indifference to the law, (3) the economic benefit gained by the violation, and (4) the extraordinary enforcement costs incurred by the state." *Id.*, citing *Dayton Malleable*, *supra*, at 153-155. On appeal, appellants only take issue with the trial court's application of the first, second, and third factors.

{¶65} With respect to the third factor, the trial court concluded defendants "avoided costs and obtained an economic benefit through [their] non-compliance" with environmental laws and the permitting process. We agree with appellants that nothing in the record supports this conclusion.

{¶66} First, the trial court found that defendants "avoided the costs of the various permits" and "substantial consulting and legal fees." The court then concedes, however, that "no evidence was offered about the potential costs of these consulting fees," if any. Additionally, even if defendants knew or should have known permits were required, they certainly would not have been responsible for that expense, as the work was done for the benefit of the Village and at the Village's request. Finally, the trial court found that defendants "obtained an economic benefit from being able to farm the extensive lands owned by the Village of Kirtland Hills." Again, the trial court stated, "no dollar amount for this benefit was offered." Regardless of the dollar amount, however, defendants did not receive this benefit as a result of violating environmental laws. Rather, it was stipulated that Mr. Osborne was allowed to farm certain property owned by the Village in exchange for the work performed on the river; i.e., it was consideration under the agreement. Due to a lack of evidence, we conclude the trial court's finding

22

that defendants gained an economic benefit from violating the law is arbitrary and unreasonable. Based on this factor alone, this matter must be remanded for the trial court to reconsider the civil penalty.

{¶67} Appellants additionally argue, with respect to the second factor, that defendants did not act in bad faith or in defiance of or indifference to the law. They claim that penalizing them for failing to remove the piles is, in essence, penalizing them for failing to reach an agreement with the Ohio EPA. While this is not an unreasonable argument under the circumstances, we do not find that the record supports this conclusion. In assessing defendants' level of recalcitrance, the trial court did not merely rely on the fact that they refused to settle. The trial court also found that "the defendants were aware of the requirement to at least obtain a National Pollutant Discharge Elimination System (NPDES) permit yet failed to do so"; and "defendants showed a disregard to the preservation of a scenic, cold water habitat and a disregard to those (the Ohio EPA and ODNR) who sought to protect and remediate the river." Nothing in the record suggests, however, that defendants acted in bad faith or indifference towards the environmental laws when they agreed to perform work in the river on behalf of the Village. Further, the trial court failed to consider that defendants ceased all activity in the river as soon as they were informed by the EPA that it was not permitted. This all should have been factually relevant to the trial court's determination of defendants' level of bad faith, defiance, or indifference to the law, yet it was not mentioned in the court's analysis. On remand, the trial court shall also expressly consider these facts when applying the second factor of *Dayton Malleable*.

{¶68} Finally, with respect to the first factor, appellants argue the state did not prove sufficient environmental harm caused by the violations. We initially note that the

23

state is not required to prove actual harm in these circumstances. "Threatening environmental health is an actionable offense; actual injury need not be shown." *Deer Lake, supra*, at ¶44 (citation omitted). The record is replete with evidence of actual injury, as well as threatened environmental health, resulting from all of defendants' activities—including placing the dredged material into the river and other locations where it caused or could cause pollution of the river. Further, there was testimony that the placement of the dredged material caused erosion of the river banks and limited access to the floodplain. While more evidence was presented as to the harm caused by the dredging activity, appellants' argument that the state did not prove "sufficient" harm caused by the pollution violations is simply untenable.

{¶69} Appellants further claim the entire purpose of this court's remand order was to have the trial court distinguish between the harms caused by the dredging activity and the harm caused by polluting the river with the dredged materials, and that the trial court did not do so. We instructed the trial court to "make a finding specifically related to the violations alleged in the complaint, to wit: discharge of materials into the East Branch Chagrin River without permits, as provided in R.C. 6111.04(A) and R.C. 6111.07(A), and thereafter limit any civil penalty to the consequences of that conduct[.]" *Osborne, supra*, at ¶58. The trial court incorporated the findings from its 2016 order that specifically related to the violations alleged in the complaint, and the civil penalty was reduced by $180,000.00, which represented the 24 days of active dredging for which defendants could not be held liable under the complaint. The remaining $224,240.00 civil penalty was imposed only for the days the piles of dredged material remained on the river banks. It is true, however, that the trial court's 2016 order did not include findings as to the harm caused by the pollution as opposed to the dredging.

24

Thus, on remand, the trial court must also explicitly consider this distinction when properly applying the first factor of *Dayton Malleable*.

{¶70} The second issue presented by appellants is well taken.

{¶71} We conclude that the trial court abused its discretion when assessing the civil penalty against appellants by not properly applying the *Dayton Malleable* factors.

{¶72} The first assignment of error has merit to the extent indicated.

{¶73} The judgment of the Lake County Court of Common Pleas is hereby affirmed as it pertains to the trial court's order of injunctive relief. The judgment is reversed as it pertains to the trial court's order of a civil penalty. This matter is remanded for further proceedings, consistent with this opinion, solely related to the assessment of the civil penalty after considering the appropriate factors supported by the record.


MARY JANE TRAPP, J., concurs,

MATT LYNCH, J., concurs in part and dissents in part, with a Dissenting Opinion.

_____

MATT LYNCH, J., concurs in part and dissents in part, with a Dissenting Opinion.

{¶74} While I find no error in the majority's resolution of the appellants' arguments in relation to the injunctive relief and concur that there were several critical flaws in the trial court's assessment of a penalty, I dissent from the majority's decision to remand for the lower court to reconsider the applicable factors and reimpose a penalty. Rather, since the evidence presented failed to provide support for the factors warranting a civil penalty, reversal of the penalty in its entirety is the appropriate remedy. Careful

consideration of the record and evidence presented in this matter reveals that the penalty was arbitrary, excessive and inconsistent with the purposes of civil penalties, as it was ineffective as a deterrent and had the impermissible effect of retribution. While multiple actors were responsible for the activity found to be in violation of the law, only appellants, who failed to accede to the settlement demands of the EPA while raising legitimate concerns with whether a violation was committed, were ordered to pay a penalty. The arbitrary nature of this penalty is further underscored by the fact that appellants ceased their dredging activity when requested, received little benefit from failing to obtain a permit, and damage caused to the environment was not specified by the EPA. With the absence of evidence in the record to support the award of a penalty, a remand is unnecessary and the penalty should be vacated.

{¶75} While I would hold that the penalty ordered by the trial court is objectionable and constituted an abuse of discretion, a broader review of the relationship between a citizen's rights and the state's administrative authority is warranted. The involvement of administrative agencies in the day-to-day lives of citizens, as well as the power these agencies wield in decision-making and enforcement, is at the forefront of this case. Unfortunately, such power may be exercised in a manner that is inconsistent, unfair, and oversteps the bounds of entities that are simply not a coequal branch of government.

{¶76} This concern with the unchecked power of administrative agencies is not a new one. Over 65 years ago, it was observed that "[t]he rise of administrative bodies probably has been the most significant legal trend of the last century[.] * * * They have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories * * *." *Fed. Trade Comm. v. Ruberoid Co.*, 343 U.S. 470, 487, 72

26

S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackson, J., dissenting).

{¶77}  Apprehension about the increase of administrative power became even more heightened following the United States Supreme Court's decision in *Chevron. U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which found that an agency's decision should be upheld by the reviewing court if it is not contrary to law, provided it is based on a "permissible construction of the statute."  The propriety of such deference has been questioned, with Supreme Court Justice Clarence Thomas expressing concerns that administrative agencies, in pursuing their objectives, would rely on their own interpretations of the law, emphasizing that the Court should be "alarmed that [the EPA] felt sufficiently emboldened by [past precedent] to make the bid for deference that it did here." *Michigan v. Environmental Protection Agency*, 576 U.S. ___, 135 S.Ct. 2699, 2713, 192 L.Ed.2d 674 (2015) (Thomas, J., concurring) (taking issue with the EPA's attempt to assert the "power to decide—without any particular fidelity to the text—which policy goals [it] wishes to pursue").

{¶78}  Overreach by administrative agencies impacts all citizens of this country. In *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 313, 315, 133 S.Ct. 1863, 185 L.Ed.2d 941 (2013), Chief Justice John Roberts observed that "the danger posed by the growing power of the administrative state cannot be dismissed," emphasizing that the administrative state "wields vast power and touches almost every aspect of daily life." (Citation omitted.)  As he aptly observed, "[t]he Framers could hardly have envisioned today's 'vast and varied federal bureaucracy' and the authority administrative agencies now hold over our economic, social, and political activities."  (Citation omitted.)  *Id.* at 313.

{¶79} While the administrative agencies within our country serve a valid purpose, their power to act in a role that goes beyond the scope of their authority undercuts citizens' rights and expectations to due process, consistent results, and confuses the role of the different branches of our government. United States Supreme Court Justice Neil Gorsuch has frequently expressed these concerns in his tenure as a federal judge, emphasizing that the implementation of policies by administrative agencies can often be inconsistent with the separation of powers doctrine and noting the impact of administrative agencies wielding too much power. *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1158 (10th Cir.2016) (Gorsuch, J., dissenting). More recently, Justice Gorsuch again warned against the dangers to the doctrine of the separation of powers posed by administrative agencies:

> Our Nation's founders were painfully aware of the dangers of executive and legislative intrusion on judicial decision-making. One of the abuses of royal power that led to the American Revolution was King George's attempt to gain influence over colonial judges. Colonial legislatures, too, had interfered with the courts' independence "at the behest of private interests and factions." These experiences had taught the founders that "'there is no liberty if the power of judgment be not separated from the legislative and executive powers.'" They knew that when political actors are left free not only to adopt and enforce written laws, but also to control the interpretation of those laws, the legal rights of "litigants with unpopular or minority causes or . . . who belong to despised or suspect classes" count for little. Maybe the powerful, well-heeled, popular, and connected can wheedle favorable outcomes from a system like that—but what about everyone else? They are left always a little unsure what the law is, at the mercy of political actors and the shifting winds of popular opinion, and without the chance for a fair hearing before a neutral judge. The rule of law begins to bleed into the rule of men.

(Footnotes omitted.) *Kisor v. Wilkie*, 588 U.S. ___, 139 S.Ct. 2400, 2426, 204 L.Ed.2d 841 (2019) (Gorsuch, J., concurring).

28

{¶80} Courts must interpret and apply law rather than allowing agencies to do so, since "[t]he framers sought to ensure that the people may rely on judicial precedent about the meaning of existing law until and unless that precedent is overruled or the purposefully painful process of bicameralism and presentment can be cleared." *Gutierrez-Brizuela* at 1151.

{¶81} Administrative agencies cannot be permitted to decide which policies to implement, enforce, and interpret, all without meaningful challenges by the party against whom enforcement is sought. The EPA should not be permitted to create rules or interpretations of rules regarding penalties for violations under R.C 6111.09 that are binding on parties without judicial guidance. Courts must not merely rubberstamp the EPA's interpretation of the law, as this risks the erosion of the separation of powers and politicization with which Gorsuch raised alarm. Allowing agencies such unchecked power leads to due process concerns and ultimately threatens citizens with the supreme power warned of by Alexis de Tocqueville:

> It [supreme power] covers the surface of society with a network of small complicated rules, minute and uniform, through which the most original minds and the most energetic characters cannot penetrate, to rise above the crowd.

Tocqueville, *Democracy in America, Volume II*, 319 (1840).

{¶82} These concerns are implicated in the present matter, where the EPA had nearly unchecked power to issue commands to appellants regarding the cleanup of the dirt piles and then, when the matter proceeded to trial, to advance and advocate for a penalty it deemed warranted based on its own internal policies and decision-making, rather than law established by properly elected legislators or neutral judges. Both of these actions sound the alarm bells raised by our forefathers and prominent legal scholars, as the EPA sought not just to aid in enforcing the law but efforted to advance

29

this power in a way that would encourage the deference from the courts that Justice Thomas found troubling.

{¶83} While the majority correctly holds that the penalty assessed by the lower court was based on arbitrary findings, this court requires only that the lower court reconsider these issues in light of its analysis on remand. There is still a great likelihood that appellants will face a large penalty for the conduct of placing dirt in piles along a riverbank which then slowly washes back into the very stream from which it came. Penalties sought and levied against only two of the several parties that were responsible for the violations highlight the significant concerns with the extensive authority exercised by the EPA and other administrative agencies, taking advantage of an imbalance of power. Inherent in many EPA enforcement actions are persistent and concerning issues regarding the arbitrary nature of deciding when legal action will be pursued. Those parties who choose to settle with the EPA, following its exact demands, often receive the benefit of avoiding civil penalties and other consequences, while those who decide to exercise their rights to challenge or question the application of the law to their circumstances face escalated consequences and harsh penalties which are multiplied day over day, resulting in excessive fines. Here, the Village of Kirtland Hills conceded to the demands of the EPA and avoided all penalties, while appellants chose not to do so and were severely penalized. Such a system incentivizes compliance with requests of the EPA and in doing so gives it extensive power to create rules which the individual citizen has no recourse to challenge or question without fear of being penalized. Such intimidation then encourages interacting solely with the EPA, thereby bypassing the judiciary and system of checks and balances in place to prevent abuse.

{¶84} Additional concerns with administrative agency power are demonstrated in the penalty recommendation made by the EPA. EPA enforcement supervisor Larry Reeder prepared a "penalty calculation," which documents the days of dredging and related activity and provides a "total penalty" if the court ordered a daily penalty of $50, $100, or $150 a day. He testified that the $50 figure was arrived at by utilizing the "Date and Valuable Decision of 1979 that [the EPA uses] in a lot of our enforcement cases," and then adding alternate amounts due to the increase in the value of the dollar since 1979. A careful review of the testimony and pertinent case law indicates this was intended to be a reference to the "*Dayton Malleable* decision" and was either improperly stated or transcribed. In *State ex rel. Brown v. Dayton Malleable, Inc.*, Montgomery C.P. No. 78-694 (Oct. 10, 1979), a corporation which manufactured iron castings was found to have discharged industrial waste into the Ohio River. The court determined that a $50 per day penalty for risk of harm to public health and the environment would be appropriate, although it is not evident from its analysis why it chose that specific amount. It is unclear, then, from the testimony presented, why the EPA has relied on the $50 amount awarded for one particular type of conduct in one case to make recommendations in other cases involving entirely different circumstances. Reeder did not provide an estimate based on the type of damage that occurred in *this* case, if any, or consider why a $50 figure per day would be applicable for the discharge of small amounts of dirt into a river in contrast to other circumstances such as discharge of industrial or toxic waste. Instead, a one size fits all approach is recommended by the EPA because an amount of $50 a day was selected by one trial court for a particular action and harm. This unfairly gives a great amount of weight to a figure that is seemingly entirely unrelated to the individual circumstances of this case. Reliance by

31

the courts on EPA recommendations is a serious concern in this type of case, risking not only abuse of power by the EPA but also an arbitrary decision based on uncertain calculations, unsupported by a clear breakdown of factors used to reach the recommended penalty.

{¶85} Although the EPA is the appropriate entity to monitor activities that may cause harm to the environment, it cannot be permitted to bully parties into compliance or impose harsh penalties for parties seeking to come to an agreement to remedy potential violations. The EPA should not be allowed to use its power to arbitrarily enforce policies in a disparate manner.

{¶86} With the foregoing concerns in mind, and recognizing that this matter has been litigated and violations against the appellants have been upheld by this court, the focus turns to the propriety of the penalty ordered by the trial court.

{¶87} In ordering the penalty against appellants, the trial court indicated its consideration of the penalty factors discussed in *State ex rel. Brown v. Dayton Malleable, Inc.*, 1 Ohio St.3d 151, 438 N.E.2d 120 (1982), which are utilized when evaluating the proper penalty for a R.C. Chapter 6111 violation. While the majority is correct in asserting that consideration of these factors has not been found to be mandatory by this court, *State ex rel. DeWine v. Deer Lake Mobile Park, Inc.*, 2015-Ohio-1060, 29 N.E.3d 35, ¶ 44 (11th Dist.), the factors allow this court to more effectively and accurately determine when a trial court has abused its discretion in assessing a penalty. Further, it has been held that a court which entered a penalty inconsistent with the evidence must consider the *Dayton Malleable* factors on remand, a disposition which underscores the importance of utilizing such factors to ensure that a penalty is not an abuse of discretion, i.e. "unreasonable, arbitrary, or unconscionable" or

32

the result of a "failure to exercise sound, reasonable, and legal decision-making." (Citation omitted.) *See Estate of Brunger*, 11th Dist. Portage No. 2018-P-0003, 2018-Ohio-4474, ¶ 9; *State ex rel. Rogers v. Elbert*, 180 Ohio App.3d 284, 2008-Ohio-6746, 905 N.E.2d 235, ¶ 61-65 (9th Dist.) (remanding to the trial court in part due to its failure to consider the deterrent effect of the penalty as well as harm caused to the environment). If an analysis of these factors demonstrates that the court did not properly exercise its discretion, reversal is warranted. When weighing the *Dayton Malleable* factors in the present matter, it is difficult to discern the rationale for ordering an individual, who is now deceased, and his company, to pay penalties. Thus, while remand may be the appropriate remedy in some cases, where the evidence presented by the EPA is so lacking in its ability to demonstrate any justification for a penalty, it is more appropriate to reverse and vacate the penalty. *See State ex rel. Cordray v. U.S. Technology Corp.*, 5th Dist. Tuscarawas No. 11AP060025, 2012-Ohio-855, ¶ 10-15 (since the lower court's assessment of the penalty for environmental protections violations was "not supported by the evidence," the appellate court entered judgment in a lesser amount); *see also Krider v. Price*, 4th Dist. Meigs No. 05CA7, 2007-Ohio-5233, ¶ 14, fn.1 ("the interests of justice, as well as judicial economy, warrant the [appellate court's] reduction" of an award of damages unsupported by the record).

{¶88} In considering the first factor, the harm to the environment caused by the violations, the testimony offered focused primarily on damage caused to the river and its inhabitants *in relation to the dredging activity*. The majority of the testimony offered by EPA witnesses related solely to concerns with altering the river environment by dredging and channelization, as well as removing rocks and natural features, impacting animal habitats. In many portions of the testimony, it is impossible to discern if any

33

degree of harm was caused by the piles either being on the riverbank or discharging dirt into the river rather than from dredging. Any testimony regarding the impact of dredging cannot be considered in issuing a penalty since this court has held that although appellants were liable for discharging dredged materials into the river, "[a]s pled, they cannot be held liable for excavating the material out of the river." *State ex rel. DeWine v. Osborne Co., Ltd.*, 2018-Ohio-3109, 104 N.E.3d 843, ¶ 47 (11th Dist.). It is imperative, then, that a distinction be made between the impacts of the dredging activity itself and of the dredged material being placed in piles along the river which ultimately leached back into the stream, the potential harm of which is much more nebulous and uncertain. Careful review of the record demonstrates that the EPA did not distinguish in a clear manner the harms caused by dredging versus discharge and a remand would simply task the lower court with arbitrarily determining what amount of damages were caused by activity other than dredging. The failure of the EPA to present clear evidence as to each of the separate offenses should not result in an arbitrarily decided punishment to the appellants.

{¶89} From this evidence, it cannot reliably be determined what, if any, significant long-term damage was done to the environment solely from the piles themselves. Although there was testimony that erosion and floodplain access limitations could be attributable to the piles, the data presented to demonstrate harm to the river and the subsequent recovery showed specific environmental consequences resulting from the dredging rather than other causes. Paul Anderson, a former Environmental Specialist for the Ohio EPA, testified extensively about impacts on the river habitat arising from "defendant's dredging" and supported this contention with statistical data. However, he did not provide corresponding quantifiable, objective data

34

that the piles of dirt caused harm to the river habitat. In testifying about the Qualitative Habitat Evaluation Index (QHEI), he noted that while an initial test in 2007 found a "very poor score" in a portion of the river, it had improved to the "borderline of good" within just a few months. Anderson further noted that the Index of Biological Integrity score, used to identify fish populations, had also improved upon testing just a year after the dredging ceased. This further bolsters the conclusion that dredging was the cause of any significant environmental harm rather than the piles since, although the piles were still present years later, the river conditions had improved shortly after the dredging activity ceased.

{¶90} Even the possible harms generally discussed, potential erosion resulting from the piles and lack of access to the floodplain due to their proximity to the river, have a tenuous connection to the activity for which appellants were found liable: discharging pollution into the river. This potential harm differs from the activity of actively placing materials within the river. At the least, it creates another significant roadblock for actually quantifying the harm that occurred. Since the lower court's conclusion was based on testimony that demonstrated specific environmental harm in relation to the dredging rather than the piles, and because a remand would not serve to clarify this issue further, a penalty for such activity would be patently arbitrary.

{¶91} Furthermore, it should be recognized that not all violations of R.C. 6111 are created equal. While the purpose of the pertinent provisions is to maintain safe, unpolluted water, significant penalties are most properly awarded in cases where serious and undisputed environmental harm occurs, such as when untreated sewage or industrial waste are discharged into a body of water. *See State ex rel. Cordray v. Helms*, 192 Ohio App.3d 426, 2011-Ohio-569, 949 N.E.2d 522, ¶ 7-8 (9th Dist.) (the trial

35

court issued a penalty of $500,000 for discharging sewage into a wetland). The present violations do not involve placing a dangerous pollutant directly into a body of water since the material here originated from the river bottom. No foreign soil came from the piles placed along the river, resulting in a lesser degree of harm than would be caused by an intentional deposit of chemical or industrial waste. Further, the EPA fails to explain how this harm differs from the impact caused by its own order to Kirtland Hills to remediate the alleged harm by placing extensive fill materials back into the river, thereby potentially causing much more significant changes to the river. The record does not reflect evidence of any environmental harm that occurred solely as a result of the slow leaching of soil from the piles. Indeed, the evidence leads to the inescapable conclusion that no harm was caused since the EPA itself was demanding that all of the material be returned to the river.

{¶92} As to the second *Dayton Malleable* factor, the violator's level of recalcitrance and defiance, appellants express a legitimate concern that they were punished for the failure to settle with the EPA. While the majority recognizes that the record does not demonstrate appellants acted in bad faith when they agreed to perform work for the Village of Kirtland Hills and emphasizes they ceased work when requested, other grounds for finding a lack of bad faith or indifference of the law are rejected, primarily that appellants were penalized for failing to settle with the EPA. It cannot be overemphasized that the Village of Kirtland Hills, by choosing to accede to the demands of the EPA, was able to avoid any penalty whatsoever. This is especially concerning given that appellants were not provided the same opportunity to reach such a deal and avoid a penalty. Reeder testified that included in the agreement with the Village of Kirtland Hills was a provision waiving future penalties in exchange for restoration work.

No such provision had been included in a proposed order/agreement submitted to the appellants. While Reeder testified that the Village of Kirtland Hills negotiated the waiver, there is no indication that appellants would have been given the same opportunity as they argued that the EPA's failure to waive the penalty precluded them from resolving this matter prior to enforcement proceedings.

{¶93} Assertions of appellants' recalcitrance are not based in fact or a reasonable interpretation of the evidence presented. Recalcitrance occurs when a party acts in a manner that is "obstinately defiant of authority or restraint." Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/recalcitrant (accessed April 22, 2020). The EPA's order to cease dredging activities was immediately followed by appellants and no further action was taken to dredge the river or otherwise move dredged materials, showing no defiance. The fact that appellants failed to enter into an agreement to remedy the concerns of the EPA in relation to the piles is not evidence of lack of compliance but, rather, demonstrates only the parties' failure to reach an agreement on how to best resolve the matter. It defies logic that appellants could be considered recalcitrant for seeking the same agreement that the Village of Kirtland Hills received: the ability to remedy the EPA's concerns without the threat of future penalties.

{¶94} In addition, appellants raised various potentially meritorious arguments that justified resistance to settlement. They questioned the applicability of the statutory requirements for seeking a permit as well as whether placing material on the bank/high water mark of the river constitutes discharge of dredged materials. While these arguments were not ultimately successful, appellants must be permitted to raise a reasonable dispute, properly resolved by a court, without facing a penalty as a consequence. It cannot fairly be said that a party with a legitimate dispute or potential

defense to an alleged wrongdoing must give up his right to raise that argument or receive a greater penalty. *Cf. State ex rel. Cincinnati Enquirer v. Daniels,* 108 Ohio St.3d 518, 2006-Ohio-1215, 844 N.E.2d 1181, ¶ 32 (holding that courts should not punish parties for taking rational stances on legal issues that have not been settled).

{¶95} As to arguments that appellants showed a disregard for the environment, potential environmental harm is inherent in all EPA-initiated proceedings and is not evidence of acting defiantly to authority. Nonetheless, the record does not signal an intent by appellants to harm the environment or reveal specific knowledge that placing dirt piles on a riverbank would cause damage to the river habitat. Again, it must be acknowledged that the "pollutant" complained of here is merely soil that originated from the river bottom. The irony should not be missed that the remediation demanded by the EPA was to destroy the piles and place the dirt, the "pollutant," back in the river.

{¶96} While the majority concedes that there was evidence of a lack of bad faith when appellants chose to perform work on behalf of Kirtland Hills, this point warrants further discussion. Any argument that, by the nature of their business, appellants were aware of the need to obtain a permit, is speculative at best. It is not evident from the record whether they believed placing dirt on the bank area of a river would constitute conduct requiring a permit, an issue which they ultimately questioned. Further, appellants performed the work at the behest of the Village of Kirtland Hills, an authority figure. It is more than reasonable to presume that they relied on the Village's request to perform the work and believed that the Village would have been aware of whether permits were needed. Osborne was acting at the request of and under the authority of the Village, much as Mr. Franz, the operator of the track hoe, was acting under the authority of Osborne, yet the EPA took no action against Franz, presumably because he

38

acted solely at the direction of Osborne. The record offers no explanation as to why Osborne should be treated any differently.

{¶97} The record demonstrates that as soon as appellants were informed that work could not proceed in the absence of a permit, they ceased dredging immediately. The penalty was ordered solely for the time after work was ordered to be stopped. At that point, appellants undoubtedly could not undertake to move the dirt piles without settling or concluding the dispute with the EPA, as they were no longer permitted to do work that would impact the river. Thus, it is unclear how they would have removed the piles at that time. This is certainly not recalcitrance. The alleged recalcitrance, then, appears not to be tied to appellants' "indifference to the law" but rather their failure to capitulate to the EPA's demands. In short, a remand is not necessary for the court to reconsider the issue of recalcitrance because the evidence would not support a conclusion against appellants on this factor.

{¶98} As to the third *Dayton Malleable* factor, the majority correctly recognizes that the benefits set forth by the trial court as the basis for concluding appellants gained an economic benefit were unsupported by evidence in the record. The trial court's conclusion is inaccurate in part because the permission to farm was not a benefit gained as a result of violating the law but was a benefit tendered in exchange for appellants' work, the equivalent of payment. It was not a benefit received from the *violation*. In comparison, if a corporation dumped toxic waste into a river to avoid a costly disposal process, this could properly be characterized as a benefit resulting from the violation, which is not the case here. *See State ex rel. DeWine v. C & D Disposal Techs., L.L.C.*, 2016-Ohio-5573, 69 N.E.3d 1163, ¶ 27 (7th Dist.) (by overfilling a landfill, defendant saved the costs associated with obtaining a proper landfill space).

{¶99} The final factor to consider is whether enforcement costs were incurred by the State, a factor which is likewise supported by scant evidence. While several witnesses testified regarding the length of time they worked on this case, none discussed the cost of the work or whether this particular enforcement interfered with any other job-related tasks they had during that time or resulted in overtime pay. Further, no testimony was offered to distinguish time spent by the EPA dealing with the Village of Kirtland versus Osborne and no evidence was presented to differentiate the enforcement costs related to the dredging violations versus the piles, which is the only activity for which Osborne is liable. To make a finding as to the enforcement costs based upon this thin record is speculative.

{¶100} In addition to the extremely limited evidence in support of the penalty under the *Dayton Malleable* factors, other grounds militate against finding a penalty is warranted. First, as outlined above, there is an overall lack of monetary justification for the penalty proven by calculable and measurable figures. The amount awarded per day is seemingly randomly determined by the trial court rather than being based on specific factors or detriment to the EPA and environment. Further, the time period for which the appellants were fined, July 13, 2007 through November 1, 2013, is arbitrary in that this was the period where their conduct was no longer violating the law, but for the fact that they were not permitted by the EPA to perform any work that would result in remedying the problem. It is also perplexing why the penalty for the Oliva pile, which was not remedied, was penalized at $40 per day while the remaining eight piles were charged at a total of $80 per day. This would amount to a fine of $10 per day for those piles, with no explanation of why this would be appropriate rather than arbitrary. If anything, the

difficulty of accessing the Oliva pile, located on a separate owner's property, would warrant a lesser penalty.

{¶101} Furthermore, one of the main purposes for the EPA bringing enforcement actions is to ensure that further environmental harm is prevented or addressed. It was evident from the record that the Village of Kirtland Hills has already removed all but one of the piles alleged to be the cause of environmental concern. Under these circumstances, the penalty is not only unnecessary as a punishment for unremedied harm to the environment but is also based on an unclear record regarding enforcement costs given that several parties were responsible for the harm.

{¶102} A civil penalty is appropriately awarded for the purposes of deterrence and remediation, where the evidence supports such a penalty, but not for retribution or punitive reasons. *Dayton Malleable*, 1 Ohio St.3d at 158, 438 N.E.2d 120 (Holmes, J., concurring in part and dissenting in part) ("It is universally agreed that the purpose of the civil penalty provisions of R.C. Chapter 6111 and similar provisions enacted in other states in accordance with the Federal Water Pollution Control Act is remedial and not punitive."); *United States v. Detrex Chem. Industries, Inc.*, 393 F.Supp. 735, 738 (N.D.Ohio 1975) (in construing a civil penalty statute, the court noted that a construction which had a "truly devastating impact" on a business "would [improperly] tend more toward confiscation than mere deterrence").

{¶103} The penalty ordered here had limited deterrent effect, thus leading to the conclusion that it was ordered for the purposes of retribution. It was ordered after Osborne had passed away and thus was assessed against his estate, an entity for which deterrence was unnecessary and unwarranted. The impact on the Osborne Company is also questionable as the behavior alleged to be improper was performed at

41

the behest of Osborne himself. Further, the penalty was ordered for a period of time where the appellants were no longer performing any activities on the property, limiting any deterrent effect. It is unclear what sort of deterrent effect the penalty would have on others within the community given the particular and unique circumstances of this case, including the fact that the Village had already remedied the concerns raised by the EPA.

{¶104} It has been held that future violations will be deterred when the penalty is large enough to hurt the offender but it should not be "so large as to result in the violator's bankruptcy." *State ex rel. Dann v. Coen*, 5th Dist. Stark No. 2008 CA 00050, 2009-Ohio-4000, ¶ 34, citing *State ex rel. Petro v. Maurer Mobile Home Court, Inc.*, 6th Dist. Wood No. WD-06-053, 2007-Ohio-2262, ¶ 62. While considering a defendant's financial status allows the court to properly determine whether a party will be bankrupted by its penalty assessment, no determination was reached on this issue.

{¶105} "[P]enalties are not favored in either law or equity and should be imposed only when clearly justified." *State ex rel. Reed, v. Indus. Comm.*, 2 Ohio St.2d 200, 203, 207 N.E.2d 755 (1965). While it is argued that a penalty here is "mandatory," it is apparent that such a penalty is not mandatory in a typical sense of the word since the EPA chose only to seek enforcement against appellants rather than other participants in the dredging of the river. Franz, the Osborne employee who conducted the dredging of the river, committed violations under the EPA's interpretation of the law but never faced an enforcement action or a penalty, while the Village avoided any penalty by acceding to the demands of the EPA. Only Osborne faced the specter of crushing penalties. Such disparate enforcement highlights the inconsistent application of administrative policies that leaves citizens with no clear guidance for when their activity might be acceptable and when it might result in damaging and excessive penalties and litigation

costs.

{¶106} In short, when evaluating a civil penalty in this context, "[t]he totality of the circumstances and the specific facts of each case guide" the exercise of the court's discretion. *State ex rel. Cordray v. Evergreen Land Dev., Ltd.*, 7th Dist. Mahoning Nos. 15 MA 0115 and 15 MA 0116, 2016-Ohio-7038, ¶ 45. When examining the totality of the circumstances in this particular matter, given the lack of evidence of intentional violations or willfully causing harm, the failure to prove the specific amounts spent on enforcement, the overall arbitrary nature of the amount awarded, and the unfair and inconsistent application of the law to the appellants and the Village, it is evident that the trial court abused its discretion in awarding a penalty of $224,240 and that the record simply fails to establish that a penalty is warranted.

{¶107} For the foregoing reasons, given the lack of evidence to demonstrate conduct by the appellants warranting a penalty, the trial court's judgment was arbitrary and the result of a failure to exercise sound, reasonable, and legal decision-making. Thus, I dissent and would reverse the lower court's judgment and vacate the penalty against appellants.